# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
November 16, 2010 Session

## NATHAN E. STEPPACH, JR. v. WILLIAM H. THOMAS, JR., ET AL.

### Direct Appeal from the Chancery Court for Shelby County
### No. CH-06-0714-3      Kenny W. Armstrong, Chancellor

### No. W2010-00606-COA-R3-CV - Filed February 28, 2011

This is the second appeal of this case, which arises from the grant of a writ of certiorari by the Shelby County Chancery Court. Upon review of the Memphis City Council's record, the trial court found that the Appellee City had not acted arbitrarily, capriciously, or illegally in either approving a planned development, or in approving the companion street closure. The trial court granted partial summary judgment in favor of the City, thereby affirming the City Council's action in approving the planned development. The issue of the companion street closure proceeded to hearing, with the trial court ultimately affirming the City Council's decision. Appellant appeals, arguing that the City Council's decision was made in violation of the Memphis City Charter and ordinances, and that the decision was the product of corruption within the City Council. Discerning no error, we affirm the action of the trial court and remand for further proceedings.

**Tenn. R. App. P. 3. Appeal as of Right; Judgment of the Chancery Court Affirmed**

J. STEVEN STAFFORD, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, P.J., W.S., and HOLLY M. KIRBY, J., joined.

David Wade and J. Lewis Wardlaw, Memphis, Tennessee, for the appellant, Nathan E. Steppach, Jr.

Allan J. Wade and Brandy S. Parrish, Memphis, Tennessee, for the appellees, City of Memphis and Memphis City Council.

### OPINION

The relevant facts are set out in this Court's previous opinion, ***Steppach v. Thomas***, No. W2008-02549-COA-R3-CV, 2009 WL 3832724 (Tenn. Ct. App. Nov. 17, 2009). In the interest of continuity, we review those facts here. On February 21, 2006, the Memphis City

Council (together with the City of Memphis, "City Defendants," or "Appellees") considered companion Agenda Items 37 and 38 concerning a planned development located on the northwest corner of Poplar Avenue and Reddoch Street (the "Planned Development"), and a companion street closure at the northern Reddoch Street-Poplar Avenue intersection (the "Street Closure"). *Steppach*, 2009 WL 3832724, at \*1.[1]   The proposed Planned Development would be located on the northwest corner of the intersection of Poplar Avenue and Reddoch Street. Reddoch Street is a north-south road, which intersects Poplar Avenue at a four-way intersection. The continuation of Reddoch Street, to the south of Poplar, is a cul-de-sac street named Reddoch Cove. Across Reddoch Street from the proposed Planned Development, i.e., on the northeast corner of the intersection of Poplar Avenue and Reddoch Street, are the Colonial Apartments, which are owned by the Harry Dermon Trust. There was evidence presented to the City Council that the property where the proposed Planned Development is located is the only single-family-residential zoned property with frontage on Poplar Avenue within more than five-hundred feet, and it is located directly between a multi-story office building and a multi-family residential apartment complex. At the time of the application, the property at 878 Reddoch Street (the "Subject Property") was owned by William H. Thomas, Jr., who made the initial applications for the Planned Development and Street Closure. *Steppach*, 2009 WL 3832724, at \*1.  The companion Street Closure would close Reddoch Street to through traffic at Poplar Avenue. *Id*.

The interested residents of the Arlington Park neighborhood, where the proposed Planned Development would be located, hired an attorney to appear on their behalf at the February 21, 2006 City Council hearing.  According to the City Council's record, the majority of neighborhood residents supported the proposed Planned Development, but only if the companion Street Closure was approved.  Specifically, the majority of the Reddoch Street residents had concerns about the volume of existing traffic on Reddoch Street and the risk of injury to children and residents of the street from the heavy traffic.  Concerning the residents of the Colonial Apartments, which are located on the northeast corner of Reddoch Street and Poplar Avenue, its attorney presented evidence to the City Council that the Colonial Apartment residents used Reddoch Street as a through-street in order to avoid making left turns onto Poplar Avenue.  The residents of the Colonial Apartments have ingress and egress directly onto Poplar Avenue, but do not have direct access to Reddoch Street.  Evidence was presented that, at that time, and in order to proceed east onto Poplar Avenue, the Colonial Apartment residents turned right out of their driveway onto Poplar

---

[1] The application was initially presented to the Memphis and Shelby County Office of Planning and Development as a request for change of zoning from residential to general in order to allow the applicant to develop the property as an office building and bank; however, in meetings with the neighborhood, the applicant determined that the project would be more acceptable if it was presented as a planned development. Therefore, the application was converted to a planned development and request for street closure.

Avenue, then turned right onto Reddoch Street, then right onto Aladdin Avenue, then right onto Yates Road, which they followed back to Poplar Avenue in order to proceed east onto Poplar Avenue by turning left at the traffic light. There was also evidence presented to the City Council that the Reddoch Street Closure is generally in conformance with the City of Memphis and Shelby County Subdivision Regulations ("Subdivision Regulations"), which permit one-thousand-foot cul-de-sacs to accommodate a maximum of thirteen to twenty-five lots on the cul-de-sac. The minority opposition to the Street Closure came from non-residents of Reddoch Street, who presently use Reddoch Street as a through-street.

After discussion, which included the Memphis and Shelby County Office of Planning and Development's ("O.P.D.") recommendation that the applications be rejected because they allegedly failed to meet the Subdivision Regulation requirements, the Council voted 12-0 to approve the Planned Development, and voted 9-2 to approve the companion Street Closure. *Steppach*, 2009 WL 3832724, at *1. On April 10, 2006, Appellant Nathan E. Steppach, Jr. challenged the action of the City Council by filing a Petition for Writ of Certiorari and Injunctive Relief in the Shelby County Chancery Court. *Id*. According to his petition, Mr. Steppach is the owner of real property, which "is in close proximity to the site of the proposed planned development." *Id*.

On April 13, 2006, Mr. Thomas transferred the Subject Property to First Capital Bank. *Steppach*, 2009 WL 3832724, at *1. Following the transfer, Mr. Steppach was allowed to amend his petition to include First Capital Bank as a defendant. *Id*. By his first amended petition for writ of certiorari, Mr. Steppach asked the court to: (1) issue a writ of certiorari, (2) find that the Council's approval of the Planned Development was fraudulent, corrupt, and/or illegal on grounds that the Council failed to follow its own procedures, (3) declare the Street Closure null and void, and (4) enjoin Mr. Thomas and First Capital from violating the subdivision's restrictive covenants. *Id*.[2]

On July 16, 2006, the City Defendants moved for summary judgment on grounds that the actions of the City Council were neither arbitrary, nor capricious, but were allegedly within the broad discretionary authority vested in the Council by the Charter of the City of Memphis. *Steppach*, 2009 WL 3832724, at *1. On July 20, 2006, the court entered a Consent Pretrial Order, which stated that "all matters unrelated to the final decisions of the

---

[2] As discussed, *infra*, Mr. Steppach moved the court for leave to file a second amended petition to add allegations of corruption. However, from our review of the record, a second amended petition was not, in fact, filed in this case. The allegations of fraud, corruption, or illegality averred in the first amended petition concern the City Council's alleged failure to follow its own procedures, but are not the same allegations of corruption discussed, *infra*, which allegedly arise from the actions of Messrs. Peete and Ford.

Memphis City Council appealed from in the petition [i.e., the issue of whether the Planned Development violates the restrictive covenants] shall be tried separately." *Id*.

On August 1, 2006, Mr. Thomas filed a motion to dismiss for failure to state a claim upon which relief may be granted. *Steppach*, 2009 WL 3832724, at \*1. Specifically, Mr. Thomas argued that, because he had sold the Subject Property to First Capital Bank, he was no longer a necessary party to the lawsuit. Mr. Steppach opposed both the City Defendant's motion for summary judgment and Mr. Thomas' motion to dismiss. *Id*.

The City Defendant's motion for summary judgment was heard on May 9, 2007. *Steppach*, 2009 WL 3832724, at \*2. On May 30, 2007, the court entered an Order, granting the motion in part, and denying it in part. *Id*. Specifically, the court held that "the City's Motion ... regarding [the] Reddoch Street Planned Development ... is granted and the City's motion ... regarding the Reddoch Street Closure ... is ... denied and shall stand trial." *Id*. Mr. Thomas' motion to dismiss was heard on June 29, 2007, and by Order of July 12, 2007, the trial court granted Mr. Thomas' motion, thereby dismissing him from the lawsuit. *Id*.

On September 23, 2008, the issues remaining in Mr. Steppach's petition for writ of certiorari were heard. *Steppach*, 2009 WL 3832724, at \*2. At this point, the trial court had ruled on the City Council's action regarding the Planned Development and had granted summary judgment in favor of the City Defendants on that issue only. *Id*. The court had dismissed Mr. Thomas from the lawsuit and had specifically reserved the issue of the restrictive covenants for separate hearing. *Id*. Consequently, the sole issue for hearing on September 23, 2008 was the Street Closure. *Id*. Following the hearing, on October 9, 2008, the court entered its "Final Decree Denying Plaintiff's Petition for Writ of Certiorari."[3] *Id*. Therein, the court found, *inter alia*, that Mr. Steppach failed to establish that the Council acted illegally or arbitrarily in reaching its decision to close Reddoch Street. *Id*. Based upon

---

[3] In our previous opinion, we explained that:

> Although the trial court states that it "denies the Plaintiff's Petition for Writ of Certiorari," it is obvious from the record that the court, in fact, issued the writ of certiorari because the record of the Council's action was brought up for review. A common law writ of certiorari simply commands an "inferior tribunal or administrative agency to send the record made before the agency in the proceeding to the court for review...." Once the administrative record has been filed, "the reviewing court may proceed to determine whether the petitioner is entitled to relief without any further motions, and if the court chooses, without a hearing."

*Steppach v. Thomas*, 2009 WL 3832724, at \*2.

-4-

this finding, the trial court affirmed its May 30, 2007 order (granting the City's motion for summary judgment regarding the Reddoch Street Planned Development) and denied Mr. Steppach relief with respect to the Council's resolutions approving the Reddoch Street Planned Development and the Reddoch Street Closure. The court specifically directed the entry of a final decree "approving the Reddoch Street Planned Development ... and the Reddoch Street Closure." Because the issue of the restrictive covenants was still pending, the trial court included Tenn. R. Civ. P. 54.02 language in its October 9, 2008 order.

Mr. Steppach appealed; however, after the appeal had been filed, on June 15, 2009, Mr. Thomas filed a motion to dismiss Mr. Steppach's appeal of the July 12, 2007 order dismissing Mr. Thomas from the lawsuit on grounds that the July 12, 2007 order was not final and appealable. *Steppach*, 2009 WL 3832724, at *3. By order of June 29, 2009, this Court declined to rule on Mr. Thomas' motion, reasoning that "this appeal has been fully briefed and is now ready to be placed on the Court's oral argument docket." *Id*. Accordingly, before reaching the substantive issues raised in the appeal, this Court first addressed the question of whether the order appealed was final. *Steppach v. Thomas*, 2009 WL 3832724, at *3. Finding that neither the May 30, 2007 order granting partial summary judgment, nor the July 12, 2007 order dismissing Mr. Thomas from the case was final, this Court entered its Order and Judgment dismissing the first appeal and remanded the case to the trial court for entry of a final order. *Id*. at *5. Upon remand, on February 11, 2010, the trial court entered an amended order, which includes Tenn. R. Civ. P. 54.02 language, and further provides, in relevant part, as follows:

> The trial of this matter was held on September 23, 2008 with regard to Plaintiff's Petition for Writ of Certiorari on the closure of Reddoch Street. Based upon the testimony of the witnesses, memoranda of the parties, documents admitted into evidence, argument of counsel and the entire record in this case, the Court finds and concludes that Plaintiff failed to establish from the record of the Council proceedings and the proof adduced at trial that the Memphis City Council acted illegally or arbitrarily in reaching its decision to close Reddoch Street and that the Council's Street Closure Resolution is hereby affirmed.
> The Court also adopts the following Findings of Fact and Conclusions of Law pursuant to Rule 52 of the Tennessee Rules of Civil Procedure, to-wit:
>
> 1. The Street Closure regulations construed in their entirety do not prohibit the Memphis City Council from consideration of the street closure application in this case due to the failure of the

applicant to obtain the signatures of property owners with frontage on the street and abutting property owners. Indeed the language of Section 602.2 of the Street Closure Regulations specifically addresses circumstances where such owners do not sign the application; yet, the regulations do not prohibit the Council from considering the application for street closure in such circumstances.

2. For the purposes of this lawsuit only, the Harry Dermon Trust, who refused to sign the street closure application, was not an "abutting property owner" as defined by Section 602.4.C of the subdivision regulations.

3. The testimony of Monice Hagler and the trial exhibits established that the Harry Dermon Trust never owned a fee interest in any portion of the Reddoch Street Property.

4. The Land Use Control Board's original belief that the Dermon Trust was an "abutting owner" under the Street Closure Regulations was, therefore, erroneous.

5. It was not critical or central to the City Council's decision to close the street whether or not the Harry Dermon Trust owned an interest in Reddoch Street.

6. Further, the mistaken belief of the Land Use and Control Board and OPD that the Harry Dermon Trust was an "abutting owner" under the Street Closure Regulations provides no legal basis for this Court to overturn the City Council's decision to close the street.

Based upon the foregoing findings, the trial court denied Mr. Steppach's motion to alter or amend, thereby approving the City Defendants' action in approving the Reddoch Street Closure. The trial court also reaffirmed its May 30, 2007 order, which granted the City's motion for summary judgment on the Planned Development, and its July 12, 2007 order dismissing Mr. Thomas as a party to this case.

Mr. Steppach filed a second notice of appeal on March 11, 2010. On April 23, 2010, this Court entered an order allowing the appellate record previously filed in this case (i.e., W2008-02549-COA-R3-CV) to be consolidated with the additional filings and transcripts filed with the second appeal (i.e., W2010-00606-COA-R3-CV). From our review of the entire record, the orders appealed are now final so as to confer jurisdiction on this Court. Tenn. R. App. P. 3(a).

Mr. Steppach raises five issues for review as stated in his brief:

1. The trial court erred in finding that Steppach failed to prove that the City Council acted illegally or arbitrarily in reaching its decision to close Reddoch Street.

2. The trial court erred in finding that the City of Memphis Street Closure Regulations did not prohibit the City Council from considering the Reddoch Street Closure application despite the failure of the applicant to obtain the signatures of the abutting property owners and those property owners with frontage on Reddoch Street.

3. The trial court erred in finding that the Harry Dermon Trust was not an abutting property owner. The Land Use Control Board's belief that the Harry Dermon Trust was an abutting property owner was erroneous. The belief of the Land Use Control Board and the Office of Planning [and] Development that the Harry Dermon Trust was an abutting property owner provides no legal basis to overturn the City Council's decision to close Reddoch Street. It was not critical or central to the City Council's decision to close the street whether or not Harry Dermon Trust owned an interest in Reddoch Street.

4. The trial court erred in granting William H. Thomas, Jr.'s motion to dismiss.

5. The trial court erred in finding that, absent proof that they improperly influenced the votes of other members of the City Council, the actions of Councilmen Ford and Peete did not taint the entire February 21, 2006 City Council vote, and, therefore, City Defendants' Motion for Summary Judgment on the Planned Development was properly granted.

## I. <u>Legislative versus Administrative Actions</u>

Before reaching the substantive issues, we first pause to address, *sua sponte*, a matter of some confusion in the record. As discussed above, in the instant appeal, we are dealing with two separate acts of the City Council. We are asked to review the approval of the street closure and by necessity the approval of the companion Planned Development.[4]

The City Council's action in approving the Reddoch Street Closure is a legislative act.

---

[4] We are not, in fact, asked to review the grant of summary judgment on the Planned Development. However, as discussed, *infra*, the Planned Development and the Street Closure are not mutually exclusive; consequently, in the interest of full adjudication, we must review both actions of the Council.

As explained in 11 McQuillin on The Law of Municipal Corporations §30:185 (3rd ed. 2010):

> Aside from constitutional restrictions, the existing plenary power of the legislature over streets is authority to vacate them. However, such authority is usually vested in municipal corporations, when exercised in the general public interest, subject to the constitutional prohibition against taking or damaging private property for public use without compensation. In other words, although the power to vacate is in the state, it may be delegated to a city.
>
> This delegation is sometimes to the board of supervisors or county commissioners, although, as to city streets, it is usually made to the common council, or other legislative authority of the municipal corporation. Indeed, it has been held that a county has no authority to vacate a street, or a part thereof, which is within the corporate limits of a municipality and is a part of its street system. Ordinarily, the proper municipal authorities wield the full and complete authority as to when streets shall be opened and closed by due observance of all applicable legal provisions. The propriety or wisdom of such a delegation of legislative power, as well as its exercise in particular cases by municipal authorities are legislative questions not ordinarily subject to review.
>
> As a municipality has no inherent power to vacate streets, the grant of authority to do so must be given in express terms or by necessary implication. While under the general welfare clause, or the police power, a municipal corporation may be authorized to close a dangerous street for the protection and safety of the public, such general grants of power are not construed ordinarily as authority to exercise discretionary powers as to the vacation of streets.

*Id*. (Footnotes omitted); *see also* **State v. Taylor**, 64 S.W. 766 (Tenn. 1901).

Because the authority to close streets has been delegated to the Memphis City Council, and because the closing of a street directly involves the health, safety and welfare of the City and its citizens, the Reddoch Street Closure is undeniably a legislative action. Conversely, in **McCallen v. City of Memphis**, 786 S.W.2d 633 (Tenn. 1990), the Tennessee Supreme Court determined that granting a planned development was an administrative, rather than legislative, act. *Id*. at 639-40.; *see also* **Mullins v. City of Knoxville**, 665 S.W.2d 393 (Tenn.

Ct. App. 1983).  The distinction between legislative and administrative actions is important insofar as this distinction dictates the means of challenging the action.  In ***Fallin v. Knox Co. Bd. of Commissioners***, 656 S.W.2d 338 (Tenn.1983), our Supreme Court explained:

> It is our opinion that an action for declaratory judgment, as provided by T.C.A. §§ 29-14-101-29-14-113, rather than a petition for certiorari is the proper remedy to be employed by one who seeks to invalidate an ordinance, resolution or other legislative action of county, city or other municipal legislative authority enacting or amending zoning legislation. However, where, as here, the plaintiff mistakenly employs the remedy of certiorari the court may treat the action as one for declaratory judgment and proceed accordingly, rather than dismiss the action. It appears that this has been the procedure followed in other jurisdictions. Thus, in 4 Anderson, American Law of Zoning, § 25.07 (2d ed. 1977) it is observed that zoning regulations are most often reviewed by a declaratory judgment action and that:
>
> > "It is worth noting that where a plaintiff seeks judicial review of a zoning amendment through a writ of certiorari, in a jurisdiction which does not permit the writ to be used for that purpose, his petition may be regarded as an application for a declaratory judgment."
>
> We wish to point out, however, that the remedy of certiorari provided by T.C.A., §§ 27-8-101, 27-9-101-27-9-113, will continue to be the proper remedy for one who seeks to overturn the determination of a Board of Zoning Appeals as provided by T.C.A., § 13-7-106 et seq. and T.C.A., § 13-7-205 et seq. This distinction in remedies is made because the determinations made by a Board of Zoning Appeals are administrative determinations, judicial or quasi-judicial in nature, and are accompanied by a record of the evidence produced and the proceedings had in a particular case, whereas, the enactment of ordinances or resolutions, creating or amending zoning regulations, is a legislative, rather than an administrative, action and is not ordinarily accompanied by a record of evidence, as in the case of an administrative hearing. *See,* ***Holdredge v. City of***

> *Cleveland*, *supra*; *Reddoch v. Smith*, 214 Tenn. 213, 379
> S.W.2d 641 (1964).

*Fallin*, 656 S.W.2d at 342.

In the instant case, Mr. Steppach does not seek a declaratory judgment on the City's legislative action in approving the Street Closure. Rather, he challenges both the decision on the Street Closure and the decision on the Planned Development under a petition for writ of certiorari. Although *Fallin* indicates that review of legislative actions should be raised by petition for declaratory judgment, the fact that Mr. Steppach proceeded under the writ of certiorari does not, *ipso facto*, prohibit this Court from addressing the Street Closure decision. Our Supreme Court has stated that, in a broad sense, the standards of review for both a petition for certiorari challenging a judicial or administrative zoning decision and for a declaratory judgment challenging a legislative decision are essentially the same. *See McCallen*, 786 S.W.2d at 641. In explaining this standard of review, our Supreme Court has stated that "whether the action by the local governmental body is legislative or administrative in nature, the court should refrain from substituting its judgment for the broad discretionary authority of the local governmental body. An invalidation of the action should take place only when the decision is clearly illegal, arbitrary or capricious." *Id*. at 642-43. In reviewing such administrative actions, "the court's primary resolve is to refrain from substituting its judgment for that of the [City Council]." *Id*. at 641. Consequently, if "any possible reason" exists, which justifies the City Council's action, that action should be upheld. *Id*. "Both legislative and administrative decisions are presumed to be valid, and a heavy burden of proof rests upon the shoulders of the party who challenges the action." *Id*. Under this standard, courts are not permitted to re-weigh the evidence or to scrutinize the intrinsic correctness of the decision. *Lafferty v. City of Winchester*, 46 S.W. 3d 752, 759 (Tenn. Ct. App. 2000). "A decision by a local zoning board will be considered arbitrary only where there is no evidence in the record to support it." *Id*.

The majority of the issues raised by Mr. Steppach require this Court to review the procedure followed by the Council or its interpretation of the relevant ordinances. Regardless of whether an action is legislative or administrative in nature, a reviewing court may review the action to determine whether the acting body followed its own procedures. *Wayne County v. Tennessee Solid Waste Disposal Control Bd*, 756 S.W.2d 274, 279 (Tenn. Ct. App. 1988). However, in so doing, we will defer to the agency's decision on questions involving its own procedures. *Id*. As noted by this Court in *Moore v. Nealy*, No. W2006-00438-COA-R3-CV, 2006 WL 3371132 (Tenn. Ct. App. Oct. 6, 2006), "[o]ne of the most venerable doctrines in administrative law is that a court will give great deference to an agency's interpretation of its own rules." *Moore*, at *5 (citing 33 Charles Alan Wright & Charles H. Koch, Jr., Federal Practice and Procedure § 8353 (2006)). In the instant case, the

-10-

distinction between the Council's legislative act in closing the street, and its administrative act in approving the Planned Development, is not paramount to our inquiry concerning whether the Council followed its own procedures. However, the distinction will become more important below in our discussion of whether corruption played a role in the City Council's actions. We now turn to the issues raised by Mr. Steppach, and first address whether Mr. Thomas was properly dismissed from this case.

## II. Grant of Mr. Thomas' Motion to Dismiss

We first address Mr. Steppach's fourth issue, concerning the trial court's grant of Mr. Thomas' motion to dismiss. On August 1, 2006, Mr. Thomas, an original party-defendant, filed a motion to dismiss for failure to state a claim pursuant to Tenn. R. Civ. P. 12.02(6), or, in the alternative, to dismiss under Tenn. R. Civ. P. 21. It is undisputed that Mr. Thomas sold the Subject Property to First Capital Bank; consequently, Mr. Thomas argued that he should be dismissed from the case because he no longer had any legal interest in the Subject Property. By order of July 12, 2007, the trial court granted Mr. Thomas' motion; however, the trial court did not state whether the motion was granted under Tenn. R. Civ. P. 12.02(6) or under Tenn. R. Civ. P. 21. Consequently, we will address both grounds.

It is well settled that a Tenn. R. Civ. P. 12.02 motion to dismiss a complaint for failure to state a claim upon which relief can be granted tests the legal sufficiency of the complaint. It admits the truth of all relevant and material allegations but asserts that such allegations do not constitute a cause of action as a matter of law. *See* ***Riggs v. Burson***, 941 S.W.2d 44 (Tenn. 1997). Obviously, when considering a motion to dismiss for failure to state a claim upon which relief can be granted, we are limited to the examination of the complaint alone. *See* ***Wolcotts Fin. Serv., Inc. v. McReynolds***, 807 S.W.2d 708 (Tenn. Ct. App. 1990). The basis for the motion is that the allegations in the complaint, when considered alone and taken as true, are insufficient to state a claim as a matter of law. *See* ***Cornpropst v. Sloan***, 528 S.W.2d 188 (Tenn. 1975). In considering such a motion, the court should construe the complaint liberally in favor of the plaintiff, taking all the allegations of fact therein as true. *See* ***Cook by and through Uithoven v. Spinnaker's of Rivergate, Inc.***, 878 S.W.2d 934 (Tenn. 1994).

Tenn. R. Civ. P. 21 provides, in relevant part, as follows:

> Parties may be dropped or added by order of the court on motion of any party or of its own initiative at any stage of the action and on such terms as are just.

The Tennessee Supreme Court has acknowledged that Tenn. R. Civ. P. 21 may be

used to dismiss defendants who are not necessary defendants. *See **State of Tennessee v. Lockert***, 631 S.W.2d 124, 126 (Tenn. 1982) (holding that Tenn. R. Civ. P. 21 was the proper vehicle to dismiss the Governor and the Attorney General as defendants in a *quo warranto* action because they were not necessary defendants).[5]

According to the amended petition, the only claim that Mr. Steppach seeks against Mr. Thomas is to enjoin Mr. Thomas from violating the restrictive covenants that allegedly control the Reddoch Street Property. The amended petition, however, acknowledges that Mr. Thomas sold the Reddoch Street Property to First Capital Bank on April 13, 2006. There is no dispute concerning the transfer of the Subject Property; however, Mr. Steppach contends that Mr. Thomas is, nonetheless, an indispensable party to this case. Specifically, he argues that, because Mr. Thomas made the initial submissions to the Land Use Control Board ("L.U.C.B."), the O.P.D., and the City Council, wherein he is listed as the owner and/or applicant of the proposed Street Closure and Planned Development site, the writ of certiorari statute, Tenn. Code Ann. § 27-9-104, requires Mr. Thomas' continued participation in the action despite the transfer of the property to First Capital Bank.[6] Moreover, Mr. Steppach contends that Mr. Thomas is a proper party to the lawsuit because "the ultimate construction of Thomas' proposed development would violate the restrictive covenants controlling [the subdivision]." As a general rule, courts usually require that:

> [A]ll persons interested, either legally or beneficially, in the
> subject matter [or the lawsuit] shall be made parties to it, either
> as complainants or as defendants, so that there may be a decree
> that will bind them all. By this means, the court is enabled to
> make a complete decree between all the parties interested in the

---

[5] Although the case law interpreting Tenn. R. Civ. P. 21 is sparse, there is ample case law interpreting its federal counterpart (i.e., Fed. R. Civ. P. 21). Under Fed. R. Civ. P. 21, a court may exercise its discretion to drop a party from a lawsuit if that party's presence no longer affects the issues being litigated. *See **Letherer v. Alger Group, L.L.C.***, 328 F.3d 262, 267 (6th Cir. 2003) (quoting ***Edgar v. City of Chicago***, 942 F. Supp. 366, 370 (N.D. Ill. 1996)); *see also **Glendora v. Malone***, 917 F. Supp. 224, 227 n. 3 (S.D. N.Y. 1996) ("Clearly the court may rely on Rule 21 to delete parties that have no connection to the claims asserted.").

[6] Tenn. Code Ann. § 27-9-104 provides:

> The petition shall be addressed to the presiding chancellor and shall name
> as defendants the particular board or commission and such other parties of
> record, if such, as were involved in the hearing before the board or
> commission, and who do not join as petitioners.

controversy, and thus not only to prevent future litigation by taking away the necessity of a multiplicity of suits, but to make it perfectly certain that no injustice has been done to any party interested in the subject matter of the suit.

*County of Giles v. First U.S. Corp.*, 445 S.W.2d 157, 160-61 (Tenn. 1969) (citing Gibson's Suits in Chancery, § 47, p. 58).

Keeping in mind not only that the relief sought is an injunction against the violation of the subdivision's restrictive covenants, but also that Mr. Thomas no longer owns the Subject Property, it appears that an injunction against Mr. Thomas would be futile. It is well settled that an injunction may only be issued to prevent irreparable injury, which is actually threatened or imminent. *State ex rel. Agee v. Chapman*, 922 S.W.2d 516, 519 (Tenn. Ct. App. 1995). In order to justify equitable relief on grounds that irreparable harm will result unless relief is granted, the injury must be real, practically unavoidable, and certain. *Chapman*, 922 S.W.2d at 519. Consequently, if a defendant can no longer cause irreparable injury to a plaintiff, any claims for injunctive relief against that defendant are moot. *See, e.g., Bowman v. Corrections Corp. of America*, 350 F.3d 537 (6th Cir. 2003) (holding that a claim by the mother of a deceased prisoner for injunctive relief as to jail medical conditions was moot because injunctive relief would have made no differences as to the legal rights of the deceased prisoner); *see also Robinson v. Corrections Corp. of America*, 14 Fed. Appx. 382 (6th Cir. 2001) (holding that prisoner's claim for injunctive relief against prison was rendered moot when the prisoner was transferred to another facility).

When Mr. Thomas sold the property to First Capital Bank, he ostensibly lost any control over the property to his successor in interest. As the result of the transfer, it is First Capital Bank, not Mr. Thomas, that is required to comply with the restrictive covenants. Because Mr. Steppach was granted leave to amend his complaint to include First Capital Bank as a party-defendant, the proper party, i.e., First Capital Bank, was brought before the court. Consequently, the trial court did not err, or otherwise abuse its discretion, in dismissing Mr. Thomas from the lawsuit under either Tenn. R. Civ. P. 12.02(6) or under Tenn. R. Civ. P. 21.

### III.  Reddoch Street Closure

As noted above, the City Council's decision to approve the Reddoch Street Closure was not adjudicated in the trial court's order granting partial summary judgment. Rather, the issue of the Street Closure proceeded to hearing on September 23, 2008, after the grant of Mr. Steppach's petition for writ of certiorari, *see* fn. 3. As briefly discussed above, review under the common law writ is limited to whether "the inferior board or tribunal has exceeded

its jurisdiction or has acted illegally, arbitrarily, or fraudulently." ***McCallen v. Memphis***, 786 S.W.2d 633, 638 (Tenn. 1990). Questions regarding the agency's own procedures are given great deference by the reviewing court. ***Wayne County***, 756 S.W.2d at 279. While we review the Council's procedures in reaching its decision under the standard of review applicable to writs of certiorari and declaratory judgments, as discussed above, the ultimate decision is legislative in nature, *see supra* 11 McQuillin on The Law of Municipal Corporations § 30:185. Consequently, if we determine that the Council did not violate its own procedures in reaching its decision, then we must affirm the decision if "any possible reason" exists to justify it. ***McCallen***, 786 S.W.2d at 641.

### A. *City Council's compliance with procedural requirements.*

Mr. Steppach first contends that the City Council's consideration and vote to approve the Reddoch Street Closure were procedurally invalid. The procedures, under which the Council was required to act, are found at Section 602.3 of the Street Closure Regulations (like the Subdivision Regulations, the Street Closure Regulations are found in the City's Code of Ordinances) and provide as follows:

> A. *Agency comment*–Upon submission of a complete application, the O.P.D. [i.e., Office of Planning and Development] shall distribute copies of the plat to appropriate agencies for their review and comment.
>
> B. *Subdivision technical review committee*–O.P.D. shall schedule the street or alley closure for review by the S.T.R.C [i.e., Subdivision Technical Review Committee] which may make comments concerning the closure and conditions of approval.
>
> C. *Notification of property owners*–O.P.D. shall give written notification to all property owners within a 300-foot radius of the street or alley closing. Notification shall be given not less than ten days nor more than 30 days prior to the land use control board meeting at which the applications are considered. In addition, a sign shall be posted by the A.G.B. [i.e., the City Council, in the instant case] at the applicant's expense at each end of the street or alley being closed providing notice of the proposed closing.
>
> D. *O.P.D. recommendation*–The O.P.D. shall recommend to the

-14-

L.U.C.B [i.e., Land Use Control Board] the approval, approval with conditions, or rejection of the application.

E. *L.U.C.B. meeting*–The L.U.C.B. shall consider the closing application not less than 35 days nor more than 75 days after it has been filed. The L.U.C.B. shall recommend approval, approval with conditions, or rejection of the application. The L.U.C.B. may, prior to the close of the meeting, hold the matter under advisement or defer a decision until the next regular meeting of the board.

F. *Notification of L.U.C.B. action*–O.P.D. shall notify the applicant in writing of the L.U.C.B. recommendation.

G. *Notification of A.G.B. meeting*–The A.G.B. shall give written notification to all property owners abutting the street or alley closing. Notification shall be given not less than ten days nor more than 30 days prior to the A.G.B. meeting at which the application is considered.

H. *A.G.B. action*–The A.G.B. shall by resolution approve, approve with conditions, or reject the application. The A.G.B. may defer action or refer the application back to the L.U.C.B. for further consideration.

I. *Transfer of title and recording*–The applicant(s) shall pay to the appropriate real estate department the cost of the transfer title and the recording of appropriate deeds prior to the recording of any deeds.

Section 602.4 lists other requirements, and provides, in relevant part, as follows:

C. *Abutting owners*–For purposes of street and alley closures, abutting owners shall mean those owners who will be recipients of all or a portion of the closed street or alley and are the owners of record at the time the closure application was filed with the O.P.D.

In the instant case, we are required to review the actions the City Council, acting as

the A.G.B., not the actions of either the O.P.D, or the L.U.C.B. Based upon the foregoing procedural mandates, the City Council, as the A.G.B., was only obligated to: (1) provide notification to all abutting property owners of the meeting at which the Street Closure would be considered, Memphis, Tenn., Code of Ordinances (i.e., Street Closure Regulations), app. B, §602.3(G); (2) approve, reject, or approve with conditions the Street Closure application recommended by the L.U.C.B., or, alternatively, to defer action and refer the application back to the L.U.C.B. for further consideration. Memphis, Tenn., Code of Ordinances, app. B, §602.3(H).

Mary Baker, the Deputy Director of the O.P.D., testified that the City Council complied with the Section 602.3 procedures. It is also undisputed that Mr. Steppach received notice and, in fact, was given the opportunity to speak against the Street Closure at the February 21, 2006 meeting. Consequently, we cannot conclude that the Council violated the §602.3(G) notice requirement.

Concerning the requirement that the Council approve, reject, approve with conditions, or defer the L.U.C.B.'s recommendation on the Street Closure, the record reveals that the City Council complied with this requirement when it approved the Street Closure with conditions. Once the Street Closure Application was recommended to the Council by the L.U.C.B. and presented by the O.P.D., the Council was required to take action on it. In so doing, the Council fully satisfied the requirements imposed by its own procedures.

## B. *Interpretation of Section 602.2(A) of the Subdivision Regulations.*

Mr. Steppach further argues that the Street Closure decision was procedurally invalid because the application form that was submitted by the applicant for the Reddoch Street Closure allegedly did not strictly conform to the requirements of Section 602.2(A) of the Subdivision Regulations. Mr. Steppach's argument necessarily hinges upon the proper interpretation of the regulation that the City is accused of violating. Section 602.2(A) of the Subdivision Regulations provides:

> A. *Official application form.* Required copies completed and signed by all abutting property owners. The chief administrative officer of the city or county may initiate a street or alley closing. Property owners with frontage on the street or alley shall sign the application. If any abutting property owners refuse to sign the application, the A.G.B. may delete that portion of the street or alley from the closure.

The rules and principles that apply to construing statutes are likewise applicable to the

-16-

construction of zoning and subdivision ordinances.  *See Moore & Assoc., Inc. v. Cobb*, 124 S.W.3d 131, 133 (Tenn. Ct. App. 2003) (citing *Lions Head Homeowners' Ass'n. v. Metro. Bd. of Zoning Appeals*, 968 S.W.2d 296, 301 (Tenn. Ct. App. 1997)).  The construction or interpretation of a statute is a question of law.  *Myint v. Allstate Ins. Co.*, 970 S.W.2d 920, 924 (Tenn. 1998).  It is well settled that this Court reviews a trial court's decision on issues of law *de novo* upon the record with no presumption of correctness.  *Id*.  In the *Lions Head Homeowners' Association* case, this Court discussed the rules of construction specifically applicable to zoning ordinances as follows:

> [W]hen the language of a zoning ordinance is clear, the courts will enforce the ordinance as written. If, however, the language is ambiguous, the courts will bring to bear the customary interpretational canons in order to arrive at the ordinance's meaning. *See Whittemore v. Brentwood Planning Comm'n*, 835 S.W.2d 11, 15 (Tenn. Ct. App. 1992).

> Accordingly, the courts construe zoning ordinances as a whole, *see Tennessee Manufactured Hous. Ass'n v. Metropolitan Gov't*, 798 S.W.2d 254, 257 (Tenn. Ct. App. 1990), and give their words their natural and ordinary meaning unless the ordinance requires otherwise. *See Boles v. City of Chattanooga*, 892 S.W.2d 416, 420 (Tenn. Ct. App.1994). A proper construction furthers the ordinance's general purposes, *see Jagendorf v. City of Memphis*, 520 S.W.2d 333, 335 (Tenn. 1974); *State ex rel. Smith v. City of Nashville*, 51 Tenn.App. 23, 29, 364 S.W.2d 106, 109 (1962), but at the same time prevents the ordinance from being applied to circumstances beyond its scope. *See Red Acres Imp. Club, Inc. v. Burkhalter*, 193 Tenn. 79, 84-85, 241 S.W.2d 921, 923 (1951).

> The courts must also construe zoning ordinances with some deference toward a property owner's right to the free use of his or her property. *See State ex rel. Morris v. City of Nashville*, 207 Tenn. 672, 680, 343 S.W.2d 847, 850 (1961); *Boles v. City of Chattanooga*, 892 S.W.2d at 420; *State ex rel. SCA Chem. Servs., Inc. v. Sanidas*, 681 S.W.2d 557, 562 (Tenn.Ct.App.1984). Accordingly, the courts should resolve ambiguities in a zoning ordinance in favor of a property owner's unrestricted use of his or her property. *See State ex rel. Wright v. City of Oak Hill*, 204 Tenn. 353, 356, 321 S.W.2d 557, 559

(1959).

*Lions Head Homeowners' Ass'n.*, 968 S.W.2d at 301.

In addition to the foregoing principles, we must also interpret the Subdivision Regulations so as not to negate, undermine, or lessen the authority vested in the City Council by the Charter of the City of Memphis (the "Charter"). The Charter, Article 50, Section 452 grants the City Council broad discretion "to close by resolution any street or alley whenever, in the judgment of the [City Council], the closing of the street or alley shall be conducive to the public welfare." Again, we reiterate that the ultimate decision to close a street is legislative in nature. 11 McQuillin on The Law of Municipal Corporations § 30:185; *State v. Taylor*, 64 S.W. 766 (Tenn. 1901). The Charter, however, does not provide any procedures for closing streets, nor does the Charter impose any limitations on the Council's authority. Rather, the Home Rule Charter of the City of Memphis authorizes the Council to adopt rules of procedure to govern its proceedings. Memphis, Tenn., Home Rule Referendum Ordinance No. 1852 § 1 (1966). Consequently, the purpose of the Subdivision Regulations is to provide a process by which the City can exercise the legislative power granted by the Charter.

In general, the Subdivision Regulations "supplement and facilitate the enforcement of the provisions and standards contained in building and housing codes, the zoning ordinance, comprehensive plan, and other ordinances, resolutions and policies of the city and county." Memphis, Tenn., Code of Ordinances app. B, § 102(C). Among the myriad purposes of the Subdivision Regulations is to "protect and provide for the public health, safety and general welfare," and to "provide sufficient and effective traffic circulation with particular regard to the avoidance of congestion on streets and highways, the safe accommodation of pedestrian traffic movements, and the proper location and width of streets, and building line locations." Memphis, Tenn. Code of Ordinances app. B, §§ 103(A), (G). The interpretation and application of the provisions of the Subdivision Regulations "shall be held to be the minimum requirements for the promotion of health, safety, and general welfare." Memphis, Tenn. Code of Ordinances app. B, § 109(A). Moreover, the Subdivision Regulations "shall not be construed as...waiving any right of the city or county under any section or provision existing at the time of adoption of these regulations." Memphis, Tenn., Code of Ordinances, app. B, §111. With these precepts in mind, we next address Mr. Steppach's issues concerning the interpretation of Section 602.2(A) of the Subdivision Regulations.

### 1. City Council's Consideration of the Street Closure Application.

Mr. Steppach argues that Section 602.2(A) of the Subdivision Regulations prohibits the City Council from considering or approving an application to close a street where

abutting property owners refuse to sign the application. We respectfully disagree.

As set out above, Section 602.2(A) of the Subdivision Regulations provides that "if any abutting landowner refuses to sign the application, the [City Council] *may* delete that portion of the street or alley from closure." (Emphasis added). "The word 'may' used in a statute ordinarily connotes discretion or permission and will not be treated as a word of command, unless there is something in the context of the subject matter of the statute under consideration to indicate that it was used in that sense." *Williams v. McMinn County*, 209 Tenn. 236, 352 S.W.2d 430, 433 (Tenn. 1961); *see also **Bd. of County Commr's of Shelby County v. Taylor***, No. 93-1490-I, 1994 WL 420922, at *4 (Tenn. Ct. App. Aug. 12, 1994) (holding that "a provision couched in permissive terms is generally regarded as directory or discretionary" and "[t]his is true of the word 'may'"). We do not find anything in Section 602.2(A) to suggest that the use of the word "may" is to be "treated as a word of command"; thus we conclude that Section 602.2(A) contemplates that an application may be considered by the City Council even when abutting landowners refuse to sign the application. Although Section 602.2(A) clearly indicates that, if abutting landowners refuse to sign the application, the City Council "may delete that portion of the street or alley from closure," there is no indication that deletion of a portion of the street is the only action the City Council can take. From our reading of the Subdivision Regulations, it appears that, if the intent of Section 602.2(A) had been to limit the City Council's actions in the face of abutting landowners' refusal to sign the application to deletion of a portion of the street from the closure, the regulation would have used mandatory language (i.e., "shall" or "will") to convey that intent. However, the use of the permissive "may," when viewed in light of the broad discretion granted to the City Council under the Charter, leads us to conclude that the City Council did not exceed its discretion in considering the Reddoch Street Closure even if all abutting property owners had not signed the application.

### 2. *Owners with frontage versus abutting property owners*.

Mr. Steppach argues that Section 602.2(A) requires all property owners with frontage on Reddoch Street, as well as any abutting property owners, to sign the application in order for it to properly be considered by the City Council. In essence, it appears that Mr. Steppach would have us read Section 602.2(A) to require two classes of owners (i.e., abutting property owners and owners with frontage on the street) to sign the application before it can proceed to the City Council for consideration. While we agree with Mr. Steppach to the extent that Section 602.2(A) is drafted so as to create some ambiguity as to whether the term "property owners with frontage" was intended to have the same meaning as "abutting owners," this fact does not, *ipso facto*, lead us to adopt Mr. Steppach's interpretation.

A statute is ambiguous where it is capable of conveying more than one meaning.

*State v. Johnson*, 79 S.W.3d 522 (Tenn. 2002); *Bryant v. HCA Health Servs. of No. Tennessee, Inc.*, 15 S.W.3d 804, 809 (Tenn. 2000). The cardinal rule of statutory construction is to effectuate legislative intent, with all rules of statutory construction being means to that end. *State v. Edmondson*, 231 S.W.3d 925 (Tenn. 2007); *Carson Creek Vacation Resorts, Inc. v. State Dept. of Revenue*, 865 S.W.2d 1 (Tenn. 1993); *Browder v. Morris*, 975 S.W.2d 308, 311 (Tenn. 1998). "In ascertaining the intent of the legislature, this Court may look to the language of the statute, its subject matter, the object and reach of the statute, the wrong or evil which it seeks to remedy or prevent, and the purpose sought to be accomplished in its enactment." *Edmondson*, 231 S.W.3d at 927 (relying on *State v. Collins*, 166 S.W.3d 721, 726 (Tenn. 2005)). Component parts of a statute are to be construed, if possible, consistently and reasonably. *See, e.g., State v. Alford*, 970 S.W.2d 944, 946 (Tenn. 1998). When construing facially conflicting statutes, this Court's duty is to give effect to the legislative intent without unduly restricting or expanding a statute's intended coverage. *State v. Davis*, 173 S.W.3d 411, 413-14 (Tenn. 2005) (citing *State v. Jennings*, 130 S.W.3d 43, 46 (Tenn. 2004)). Statutes involving the same subject must be construed harmoniously, so that they do not conflict. *State v. Turner*, 193 S.W.3d 522 (Tenn. 2006); *In re Akins*, 87 S.W.3d 488, 493 (Tenn. 2002 (citing *Parkridge Hosp., Inc. v. Woods*, 561 S.W.2d 754, 755 (Tenn. 1978)). Furthermore, the rules of statutory construction direct courts not to "apply a particular interpretation to a statute if that interpretation would yield an absurd result." *State v. Sims*, 45 S.W.3d 1, 11 (Tenn. 2001). Moreover, specific statutory language will control over general conflicting statutory provisions. *See, e.g., Arnwine v. Union Co. Bd. of Educ.*, 120 S.W.3d 804, 809 (Tenn. 2003).

In addition to the foregoing principles of statutory construction, this Court is further guided by the doctrines of *noscitur a sociis* and *ejusdem generis*. These concepts were discussed by our Supreme Court in *Sallee v. Barrett*, 171 S.W.3d 822, 828-29 (Tenn. 2005):

> Under the doctrine of *noscitur a sociis*, "the meaning of questionable or doubtful words or phrases in a statute may be ascertained by reference to the meaning of other words or phrases associated with it." Black's Law Dictionary 1060 (6th ed. 1990); *see also Hammer v. Franklin Interurban Co.*, 209 Tenn. 399, 354 S.W.2d 241, 242 (1962) (holding that statutory terms should be construed with reference to their associated words and phrases). The doctrine of *noscitur a sociis* permits courts to modify and limit subordinate words and phrases in order to harmonize them with each other and with the evident purpose of the statute. *See Scopes v. State*, 154 Tenn. 105, 289 S.W. 363, 364 (1927).
> *Ejusdem generis* is an illustration of the broader maxim

of *noscitur a sociis*. Under this doctrine of statutory construction, "where general words follow the enumeration of particular classes of things, the general words will be construed as applying only to things of the same general class as those enumerated." Black's Law Dictionary 517 (6th ed. 1990); *see also **Lyons v. Rasar***, 872 S.W.2d 895, 897 (Tenn. 1994) (citing ***Nance ex rel. Nance v. Westside Hosp.***, 750 S.W.2d 740, 743 (Tenn.1988)); ***State v. Sims***, 909 S.W.2d 46, 49 (Tenn. Crim. App. 1995). In other words, "'where it clearly appears that the lawmaker was thinking of a particular class of persons or objects, his words of more general description may not have been intended to embrace any other than those within the class.'" ***Automatic Merch. Co. v. Atkins***, 205 Tenn. 547, 327 S.W.2d 328, 333 (1959) (quoting ***State v. Grosvenor***, 149 Tenn. 158, 258 S.W. 140, 141 (1924)).

Section 602.2(A) of the Subdivision Regulations states that "***property owners with frontage on the street***...shall sign the application," and that,"[i]f any ***abutting property owners*** refuse to sign the application, the [Council] may delete that portion of the street." (Emphasis added). Under Mr. Steppach's interpretation, the terms "property owners with frontage" and "abutting property owners" refer to two classes of owners. The Subdivision Regulations contain no definition of "property owners with frontage"; however, Section 602.4(C) of the Subdivision Regulations defines "abutting owners" as those "who will be recipients of all or a portion of the closed street." Mr. Steppach argues for an interpretation of "property owners with frontage" as the converse of "abutting owners"–i.e., under Mr. Steppach's argument, "property owners with frontage" would be those landowners who will *not* be the recipients of all or a portion of the closed street. On the other hand, the City Defendants argue that the terms "abutting property owners" and "property owners with frontage" are synonymous. Consequently, the City Defendants contend that the two terms should be given the same meaning–i.e, both "property owners with frontage" and "abutting property owners" should be read under the definition in Section 602.4(C) as owners who *will* be the recipients of all or a portion of the closed street. Although there is merit to both Mr. Steppach's and the City Defendants' arguments, this Court must adopt an interpretation that will support the legislative intent and which does not usurp the City Council's legislative authority. Consequently, we must read Section 602.2(A) in the context of the entire Subdivision Regulation scheme.

The term "abutting property owner" is used two times in Section 602.2(A). It is also

-21-

used in Sections 602.2(B), and (D).[7]  And the term is defined in Section 602.4(C), *supra*. The only reference to "property owners with frontage on the street" is in Section 602.2(A), which provides that "property owners with frontage on the street...shall sign the application." This statement is immediately followed by the phrase "if any abutting property owners refuse to sign the application, the [City Council] may delete that portion of the street...from the closure."  The close proximity of these terms creates a reasonable inference that "abutting property owners" is meant to be synonymous with "property owners with frontage."  Close proximity of words, however, is insufficient to glean legislative intent, especially in light of the fact that the drafter did, in fact, use two different terms.

Turning to Section 602.2(B), it is clear that "abutting property owners" may not withdraw their consent after the application is filed with the O.P.D.  However, there is no similar prohibition on the withdrawal of consent by "property owners with frontage."  If this Court adopts Mr. Steppach's argument that "abutting property owners" and "property owners with frontage" are two separate classes, then Section 602.2(B) would confer greater rights on "property owners with frontage" because it contains only a prohibition against withdrawal of consent from "abutting property owners."  This interpretation leaves the door open for "property owners with frontage," who are not specifically named in Section 602.2(B), to withdraw their consent, while "abutting property owners" would be prohibited from so doing under Section 602.2(B).  It is more in keeping with the Charter's grant of broad discretion in street closure decisions to interpret "abutting property owners" and "owners with frontage" as one and the same for purposes of 602.2(B)–i.e., once an abutting property owner, or one with frontage, signs the application, his or her consent cannot be withdrawn after the application is sent to the O.P.D.  Mr. Steppach's interpretation would create a somewhat irrational result, where the "property owners with frontage" would ostensibly have a veto power  to withdraw their consent, while not allowing "abutting property owners" the same ability to withdraw consent.  We do not believe that this disparate result is in keeping with the regulatory scheme.

From  a  practical  standpoint,  if  this  Court  were  to  adopt  Mr.  Steppach's

---

[7] Sections 602.2(B) and (D) of the Subdivision Regulations provides:

> B.  *Withdrawal of consent*–After an application has been filed with the O.P.D., the withdrawal of consent to the closure by an abutting property owner is prohibited.

> \*                              \*                              \*

> D.  *Plat*–A plat of the street or alley closure drawn to scale, and the names of all abutting property owners.

recommendation, the sheer number of persons required to sign an application for a street closure could create a logistical nightmare, which could stymie the street closure procedures, and thereby usurp the City Council's legislative authority. The parcel map used by the L.U.C.B to determine the property owners within a three-hundred-foot radius of the proposed street closing shows twenty-two property owners on the short section of Reddoch Street. In a city such as Memphis, the number of property owners with frontage the entire length of a street could number in the several hundreds. Furthermore, and perhaps more importantly, Mr. Steppach's interpretation would require the applicant to obtain the consent of persons who are not even entitled to notice of the L.U.C.B. hearing as set forth in Section 602.3(C), *supra*.

Moreover, Mr. Steppach's interpretation could arguably render the Section 602.4(C) definition of "abutting property owner" superfluous. As noted above the term "property owners with frontage" is not defined, but would, necessarily, include "abutting property owners." However, as defined, "abutting property owners" would not, necessarily, include "property owners with frontage." If the drafter had intended "property owners with frontage" to have the same rights as "abutting property owners," then it would not be necessary to define the term "abutting property owners." Mr. Steppach's interpretation would cause the isolated term "property owners with frontage," which is used only once in the Subdivision Regulations, to trump the regulations' clear intent to recognize an abutting property owner's reversionary rights to dedicated property under Section 602.(C).

While this Court is required to assume that the Council used each word purposefully and that those words convey intent and have a meaning and a purpose, this rule of construction is limited by the duty of this Court to harmonize all of the provisions of the Subdivision Regulations so that they do not conflict with the objective and purpose of the entire statutory scheme. Accordingly, the Court may modify and limit subordinate words and phrases in order to harmonize them with each other and with the evident purpose of the statute. *Sallee v. Barrett*, 171 S.W.3d at 828-29. Mr. Steppach's proposed interpretation construes the Subdivision Regulations so as to give "property owners with frontage on the street" (who have no legal rights to a reversionary property interest in the closed street, and who may reside miles from the site of the street closure) greater procedural rights than abutting owners (who do have a vested right to reversion upon the closure of the street). Under Mr. Steppach's argument, property owners with frontage on the street would also have the power to prohibit the Council from even considering the application by withholding consent, while abutting property owners with the greater property rights would not be allowed to withdraw consent. Finally, Section 602.3(C) requires notice of the L.U.C.B.'s hearing only to those property owners within a three-hundred-foot radius of the street closure, and Section 602.3(G) requires that notice of the City Council's hearing be given only to abutting owners. Therefore, we decline to adopt Mr. Steppach's proposed interpretation of

the terms "owners with frontage on the street" and "abutting property owners" to mean two separate classes; rather, based upon our interpretation of the legislative intent, the foregoing principles of statutory construction, and the broad discretion granted to the City Council in decisions regarding street closure, we conclude that an interpretation where "abutting property owners" and "property owners with frontage" are synonymous is in better harmony with the Subdivision Regulations as a whole.

### 3. Section 602.2 submission requirements.

In addition to the foregoing arguments, Mr. Steppach further asserts that the City Council somehow violated the submission requirements set out at Section 602.2, *supra*. In response, the City Defendants submit that the L.U.C.B. and the City Council are not prohibited from considering any street closure application presented to it by the O.P.D., or from waiving any of the submission requirements imposed on the applicant of a street closure even if this Court were to conclude that the ordinance requires the signatures of both property owners with frontage on the street and abutting property owners.

Section 602.2, only governs the "Submission Requirements" of the applicant. While these submission requirements impose duties on the applicant, the abutting property owner, and arguably the O.P.D., there appears to be neither any duty imposed upon the Council, nor any limits on its legislative power to close streets. In fact, it would appear that these submission requirements are, in fact, for the benefit of the City Council. Consequently, it is not unreasonable to say that the Council may waive these submission requirements to consider an application without full compliance therewith, so long as any rights granted under the requirements are not undermined.[8] From our review, the submission requirements do not appear to grant any rights to the applicant or other interested parties, except to say that, if an applicant complies with the submission requirements, he or she has a right to have the application processed and considered. However, if an applicant does not fully comply with the submission requirements, it appears that the Council may, but is not required to consider the application.

When Section 602 is read in light of the Subdivision Regulations as a whole, the submission requirements appear to serve an entirely different function than the procedures outlined in Section 602.3. We cannot lose sight of the fact that it is the procedures section of the Subdivision Regulation, i.e., Section 602.3, that outlines the substantive procedural requirements the City must meet before closing a street. When read in the full context of the

---

[8] By way of analogy, our interpretation would give the City Council a discretionary power similar to this Court's power to suspend the Rules of Appellate Procedure (with the exception of those rules conferring jurisdiction on this Court) in order to effect proper adjudication of cases. Tenn. R. App. P. 2.

Subdivision Regulations, it is only Section 602.3 that imposes a duty on the L.U.C.B. and the City Council. Consequently, it is the requirements of Section 602.3, as opposed to Section 602.2, that may not be waived by the Council.

The City cannot waive, by contract or ordinance, its obligation to protect the health, safety and welfare of its citizens." *American Chariot v. City of Memphis*, 164 S.W.3d 600, 601 (Tenn. Ct. App. 2004) (holding that an ordinance that permits private citizens to arbitrarily and capriciously restrict the exercise of lawful governmental power which serves the public welfare unlawfully delegates the City's police and legislative power to private citizens); *Bristol Tennessee Housing Auth. v. Bristol Gas Corp.*, 407 S.W.2d 681 (Tenn. 1966) ("police powers cannot be controlled or limited by contract"). Under Mr. Steppach's interpretation, the City Council would be prohibited from closing a street upon the application of an abutting landowner if a "property owner with frontage on the street" refused to sign the application, regardless of whether the Council had determined that it was in the best interests of the public to close the street. Such interpretation would grant a private property owner the right to prevent the City Council from exercising its powers for the public welfare. Such a private veto would be an unconstitutional delegation of the Council's legislative power. Consequently, we must conclude that the submission requirements do not impose a duty on the Council, and that the Council may waive the requirements so that the Council may exercise its legislative power to close a street in the interests of the public welfare.

### 4. *Harry Dermon Trust.*

Much of Mr. Steppach's argument hinges upon whether the Harry Dermon Trust (the "Trust"), which is the owner of the Colonial Apartments at the corner of Reddoch Street and Poplar Avenue, was required to sign the application for the Planned Development and companion Street Closure. As discussed in detail above, only "abutting property owners" are required to sign the application.

Before reaching the substantive issue, we first review the relevant procedural and factual history. The Trust is not a party to this action and did not appeal the City Council's action in approving either the Street Closure, or the Planned Development. In fact, Dennis Baer, who is a fifty percent owner of the Trust, testified that he and his partners made a conscious decision not to challenge the City Council's actions; however, he further testified that this decision was based, in part, upon the owners' belief that the Trust would be deeded at least half of the closed street under Section 602.4(C).

The O.P.D.'s initial recommendation was that the Reddoch Street Development and companion Street Closure be rejected. This recommendation was based upon the O.P.D.'s

interpretation of Section 602.2 of the Subdivision Regulations. Specifically, the O.P.D. opined that the Trust, as the owner of the Colonial Apartments, was required to sign the application as an abutting landowner. Because the Planned Development necessarily hinged upon approval of the companion Street Closure, the O.P.D. indicated that it "could not support the proposed development if it did not require the closure of Reddoch Street," but stated that this recommendation "should not be considered to reflect upon the merits of the proposed development *per se*." The O.P.D.'s recommendation hinged upon its interpretation of Section 602.2, and specifically its determination that the Trust was an abutting landowner, which was required to sign the application. In the absence of the signature, the O.P.D. opined that neither the Street Closure, nor the Planned Development (because the Planned Development depended on the Street Closure) should be approved. Despite the O.P.D.'s recommendation, upon its review, the L.U.C.B. approved both the Reddoch Street Planned Development, and the companion Reddoch Street Closure applications. L.U.C.B. members indicated that the validity of the application should be determined by the City Council and recommended that a legal opinion should be obtained in connection with the City Council's hearing on the matter. Mary Baker testified that, prior to the City Council's hearing, she received an opinion from the City Attorney's Office regarding the ability of the O.P.D. to accept and process the application without the consent of the Trust. The City Attorney opined that the Council possessed the authority to approve the application without the approval of abutting property owners. Ms. Baker further testified that there have been other applications for street closures that have been "brought through the system" by the O.P.D. even though these applications were missing the signatures of some of the property owners with frontage on the street closure. By way of explanation, Ms. Baker stated that O.P.D. had adopted a "policy [whereby] they [i.e., O.P.D.] go on and file and get it [i.e., the application] in front of the Memphis City Council."

At the September 23, 2008 hearing on the Street Closure, Mary Baker testified that, although she was not initially aware of the definition of "abutting property owner," as used in the Subdivision Regulations, she had examined the Subdivision Plat in the O.P.D. file, and had determined that the Trust was not, in fact, an abutting owner as defined in Section 602.4(C) of the Subdivision Regulations. Specifically, Ms. Baker testified that, at the time of the application, the Colonial Apartments would not be a recipient of any reversionary interest pursuant to Section 602.4(C). From our review of the record, it does not appear that the Trust produced any evidence to show that it was, or ever had been, an abutting property owner as defined by Section 602.(C), i.e., there is no proof that the Colonial Apartments had a reversionary interest in the Street Closure. However, Ms. Baker conceded that, as a matter of practice, the O.P.D. had been treating those owners with frontage on the street as abutting property owners. After the filing of the instant lawsuit, Ms. Baker explained that she had reviewed the file more carefully and had discovered that the "Arlington Park Subdivision had dedicated the land for [Reddoch] street, and that the property on the east side of the street was

not included in the [Arlington Park] subdivision." Consequently, a new deed map was drawn to reflect that the entire portion of the closed right-of-way would go to the property owner on the West side of the street, i.e., the owner of the Subject Property. On cross examination, Ms. Baker confirmed that the subdivision plat, from which she determined that the street was completely dedicated by Arlington Park Subdivision, was in the O.P.D. file when this matter was first processed. The plat that was in the O.P.D. file contains the dedication certification; however, it appears that the O.P.D. failed to present the plat to the L.U.C.B. when the O.P.D. made its recommendation that the abutting property owner to the east had to sign the application.

There is no evidence in the record that the Trust dedicated any portion of the Reddoch Street Closure to the City.[9] Rather, the testimonies of Ms. Baker and Ms. Hagler (fn. 9) confirm that the entire dedication of Reddoch Street was by the owners of the Arlington Park Subdivision, as entered in the Register's Office of Shelby County, Tennessee, at Plat Book 24, Page 63 on September 15, 1960. This dedication created an easement in favor of the City over this portion of the subdivision, with fee simple ownership remaining with the dedicator subdivision and its successors in interest. This dedication did not transfer any interest in the fee simple to the Trust, or its predecessors in interest. However, the dedication was not complete until the City accepted it and agreed to be responsible for its upkeep, maintenance, repair, and policing. Upon acceptance, the City obtained an easement so long as the easement was used for a street. When the City abandons the easement or ceases to use it as a street, the City's easement ends and the property reverts to the dedicators or their successors in interest. This rule was explained in ***City of Memphis v. Overton***, 392 S.W.2d 98 (Tenn. 1965):

---

[9] Ms. Baker further confirmed that no evidence concerning title to the closed street was presented to the City Council for consideration, nor was the term quitclaim referenced, nor did the Council consider who would receive the property in its deliberations. The typical procedure after the Council has approved closure of a street is for the real estate department of the City to make a determination as to who is the proper recipient of the closed portion of the street.

Debra Daniels, manager of the City of Memphis Real Estate Department, testified that her office prepares resolutions for proposed street closures using a standard form. The procedure for a closing with conditions, such as the one in the instant case, is for applicant to complete the conditions once the resolution is adopted by the Council. Once the conditions are completed, the matter then goes back to the O.P.D. or to engineering to certify that the conditions have been met. Thereafter, the resolution is forwarded to the real estate department, for preparation of a quitclaim deed, depending on how the property was acquired. The real estate department conducts a title search to determine how to deed the property, and does not rely on the O.P.D.'s opinion on the issue. Monice Moore Hagler, a real estate attorney for the City, testified that First Capital Bank, the current owner of the Subject Property for the Reddoch Street Planned Development, should be the recipient of the closed street once the City Council's resolution becomes final. Her opinion was based upon the abstract received from Lawyers' Title showing that the property was originally dedicated on a subdivision dedication.

First, under the general rule in this State, it is elementary that where property is dedicated for a public use, the public acquires only an easement in the property dedicated. In such a situation, the underlying fee remains either in the dedicator (or his heirs), or it belongs to the abutting property owners where the easement conveyed i[s] for a street o[r] highway.

Thus, we begin with an assumption that the original proprietors of the City did not intend to surrender their fee simple ownership. Indeed it has long been recognized that a common law dedication:

> "consists in the right of way over the land of another, and not of an interest in the land itself; that remains in the owner of the fee, unaffected by the dedication...."

*Overton*, 392 S.W.2d at 100 (quoting *Scott v. State*, 33 Tenn. 629, 632-633 (1854)) (some citations omitted).

Under this rule, Mr. Steppach's argument that all property owners with frontage on the Street Closure, even those who did not dedicate any portion of the street, should be entitled to one-half of the street upon its closure, is incorrect. First, the City has no title to give the Trust. Once the City ceases to use the easement as a street, it automatically reverts to the owner of the fee simple. On the other hand, if the City acquired the easement by condemnation, as opposed to dedication, then the City must be reimbursed by the recipient. Furthermore, while Subdivision Regulation Section 602 presents the procedure for closing a street or alley, it does not create any property rights. Rather, Section 602.4(C) confirms existing law and provides that an abutting property owner is the person(s) who is the recipient of the closed street. From our reading, the Subdivision Regulations do not create any rights, but simply recognize the vested reversionary rights of the recipient. In short, the City's Subdivision Regulations cannot alter the property rights of the fee simple owner without just compensation.

In *Baker v. Butler*, 364 S.W.2d 916 (Tenn. Ct. App. 1962), this Court distinguished the rights of a City *vis-a-vis* the dedicators and the rights of the purchaser of lots from the subdivision owners. As to the City, the dedication is not binding upon it without acceptance by the City:

> As against the proprietor, a dedication of land for streets and

highways may be complete without any act of acceptance on the part of the public; but in order to charge the municipality or local district with the duty to repair, to make it liable for injuries for suffering the street or highway to remain defective, there must be an acceptance of the dedication. This acceptance may be express or implied.

**Baker v. Butler**, 364 S.W.2d at 921-22 (citation omitted). As between the dedicator and the purchaser of lots in the subdivision, this Court stated:

> The principle is settled, and so far as we can see, is uncontroverted by any authority, that a common law dedication of land to a public use ... may take place at once if the act of dedication is unequivocal, and others have acted on the question in view. [] Mr. Dillon says of such dedication the rule is as follows: 'While a mere survey of land by the owner into lots, defining streets, squares, etc., will not, without sale, amount to a dedication, *yet a sale of lots with reference to such plat, or describing lots as bounded by streets, etc., will amount to an irrevocable and immediate dedication, binding on both vendor and vendee*.'
>
> *                              *                              *
>
> We also quote from the opinion of this Court, written by Senter, J., in the case of **Sawtelle v. Astor**, 23 Tenn. App. 33, 126 S.W.2d 367 [(Tenn. Ct. App. 1938)], 168 A.L.R. 758, as follows:
>
>> 'We think it is also the law that where the owner of property gives a deed with a call for a street or alley or other way as adjoining the property conveyed, he is estopped to assert that such a right of way does not exist. In other words, he can not convey the property abutting the street or alley and afterwards deny to the grantee the right to use the street or alley.'

**Id.** (some citations omitted) (emphasis added).

As shown in this record, the Trust did not acquire its property from the subdivision owner/dedicator. Consequently, the Trust owns no part of the street and cannot, by law, be the recipient of any part of the proposed Street Closure.

Based upon the discussion above, the Trust was not an "abutting owner." Therefore, it was not required to sign the application, and the O.P.D.'s recommendation to deny the Planned Development and companion Street Closure was erroneous as its action was based upon its belief that the Trust was, in fact, an abutting owner.

We further note that the City Council did not determine, or even consider, the question of who would be the ultimate owner of the closed street. The deputy director of the O.P.D. specifically testified that no evidence concerning title to the closed street was presented to the City Council for consideration, neither was the term "quitclaim" referenced, nor did the Council consider who would receive the property in its deliberations. The resolution passed by the Council contains a diagram of the closed portion of the street but does not state that the closed portion of the street is to be deeded to any particular person. Instead, the resolution provides that "the Mayor be, and he is hereby authorized to execute Quitclaim Deed to the owners of the properties abutting on the above described thoroughfare, and said Deeds not to be delivered until the conditions herein stated have been met by the applicant." To clear any confusion as to whether the City Council, during the hearing on the Reddoch Street Closure, considered the erroneous proposed quit claim deeds, which were in the O.P.D. file, Lisa Geater, City Council Administrator, testified that the City Council does not receive any materials other than an agenda for regular council meetings. The agenda for the February 21, 2006 meeting references the Street Closure resolution as item number 38 and indicates that the request is to close and vacate the street right of way. There is no mention of the quitclaim deed or who the property is to be deeded to upon closure in the agenda or minutes of the City Council.

In any event, neither the O.P.D., the Council, nor Mr. Steppach can divest the lawful property rights of the true abutting owner (i.e., Owner of Lot 1, who did sign the Street Closure application).[10] The Trust, as an interested, i.e., owner in close proximity to the Planned Development (as opposed to abutting) property owner was given notice and an opportunity to be heard before the L.U.C.B. and the Council; however, the Arlington Park Subdivision neighbors prevailed. There is no basis upon which this Court can conclude that the City Council acted illegally or arbitrarily in reaching its decision to close Reddoch Street.

### C. *Street Closure based on Public Welfare*.

_____

[10] If the Trust believes that its property rights have been taken without just compensation, then it has a separate remedy.

Having determined that the City Council did not violate its procedures in approving the Street Closure, and that the application was not, otherwise, invalid because of the lack of the Trust's signature, the City Council may approve the Street Closure under its broad authority granted by the Charter and Ordinances, so long as the Street Closure is in furtherance of the public welfare. As discussed above, the Street Closure is a legislative action and our review is limited to whether there is a rational basis for the City's decision. *Lynn v. Polk*, 76 Tenn. 121, 1881 WL 4428 (Tenn. 1881). Turning to the record, there is ample evidence to support the City Council's approval of the Reddoch Street Closure. The majority of the interested residents of the Arlington Park neighborhood supported the Planned Development, so long as the Council also approved the companion Street Closure. In fact, the evidence suggests that the majority of the Reddoch Street residents had concerns about the volume of existing traffic on Reddoch Street, and feared that the increased traffic from the Planned Development would threaten the safety of the residents of Reddoch Street, including at least thirty children. There are several letters in the City Council's record, which were written by Reddoch Street residents in support of the Street Closure.

The primary objection to the Street Closure was that it would prohibit some forty residents of the Colonial Apartments from using Reddoch Street as a "cut-through." However, as further discussed, this is a practice that the Subdivision Regulations specifically discourage. *See* Memphis, Tenn., Code of Ordinances (i.e., Subdivision Regulations), app. B, §§ 404.1(C),[11] 404.2(C),[12] and 404.3(D).[13] An attorney for the owner of the Colonial Apartments addressed the City Council and presented a petition from twenty-five residents of the apartments, who objected to the closure because they periodically used Reddoch Street as a through-street in order to avoid making left turns onto Poplar Avenue. Nevertheless, as discussed above, the residents of the Colonial Apartments are not residents of Reddoch Street and do not have ingress and egress onto Reddoch Street. Although these residents admittedly use Reddoch Street as a through-street, the record clearly shows that the ingress and egress from the Colonial Apartments is onto Poplar Avenue. As noted above, in order to proceed east onto Poplar Avenue, the Colonial Apartment residents turn right out of their driveway onto Poplar Avenue, then turn right onto Reddoch Street, then right onto Aladdin Avenue, then right on Yates Road, which they follow back to Poplar Avenue in order to proceed east

---

[11] This Section addresses the general arrangement and layout of streets, and provides that the street pattern shall "discourage[] through traffic."

[12] Section 404.1(C) concerns the classification of public streets, and cautions that "[s]ervice for through traffic is deliberately discouraged."

[13] This section addressed intersections, and states that "[a]rterials should intersect with other arterials and collector roads. Local streets intersecting arterials shall be discouraged. Intersections of local streets with limited access roads shall not be permitted."

on Poplar Avenue by turning left at the traffic light. If Reddoch Street is closed, this practice would not be blocked, rather the route would change. In the absence of Reddoch Street as a through-street, the Colonial Apartment residents would use Valleybrook Drive, Spainwood Avenue, and Yates Road as alternative routes to Poplar Avenue. The record shows that Valleybrook Drive and Yates Road are collector roads that are controlled by a traffic light at their intersections with Poplar Avenue.

It appears from the evidence submitted to the City Council that the approval of the Reddoch Street Closure was consistent with the provisions of the Subdivision Regulations relating to the classification of public streets. In fact there was already evidence that Reddoch Street was being used as a through-street. It is undisputed that Reddoch Street is a "local" street, which the Subdivision Regulations define as follows: "Residential streets not classified in a higher system, primarily providing direct access to abutting land and to collector streets. They offer the lowest level of mobility and usually carry no bus routes." Service for through traffic is deliberately discouraged." Memphis, Tenn., Code of Ordinances, app. B, § 404.2(C). Section 404.3, which governs access and circulation, further provides that "local streets intersecting arterials shall be discouraged." Moreover, the Subdivision Regulations governing the general arrangement and layout of public streets provides as follows:

> The street pattern shall be based upon the following general design criteria:
>
> Provide for adequate vehicular access to all properties within the development;
>
> Provide street connections to adjacent properties to ensure adequate traffic circulation within the general area;
>
> Provide a local residential system which discourages through traffic and provides adequate access for fire, police, and other emergency vehicles....

Memphis, Tenn., Code of Ordinances, app. B., §404.1(A)-(C). Based upon the plain language of the foregoing Subdivision Regulations, we conclude that the closure of Reddoch Street at the intersection of Poplar Avenue, as approved by the City Council, comports with those provisions that specifically discourage through-traffic and the intersection of local streets such as Reddoch Street with arterials such as Poplar Avenue. In addition, there is no indication that the closure of Reddoch Street would interfere with adequate access for fire, police, or other emergency vehicles.

While the closure of Reddoch Street may somewhat inconvenience the residents of the Colonial Apartments to the extent that these residents may have to take a slightly longer route to Poplar Avenue via Valleybrook Drive and Yates Road, the use of Valleybrook Drive and Yates Road (which are collector streets) for through-traffic is more consistent with the Subdivision Regulations, than is the use of a local street (i.e., Reddoch). *See* Memphis, Tenn., Code of Ordinances, app. B. §§ 402.2(B), 402.3(D) (defining collectors as streets "penetrating neighborhoods, collecting traffic from local streets and channeling it into the arterial systems," and providing that "arterials should intersect with other arterials and collector roads.").

Tennessee courts have held that if "any possible reason" exists justifying the City Council's action, it should be upheld, and that "a heavy burden of proof rests upon the shoulders of the party who challenges" such action. ***McCallen***, 786 S.W.2d at 641. In light of the Subdivision Regulations discouraging through traffic on local roads, the concerns expressed by Reddoch Street residents regarding the volume of existing through traffic on Reddoch Street, and the potential hazard created therefrom, we conclude that there was sufficient evidence to support the City Council's decision to approve the Reddoch Street Closure for the public welfare.

## IV. **Allegations of Corruption**

Mr. Steppach makes three arguments relating to alleged corruption, bad faith, or fraud of former Memphis City Council members. Namely, Mr. Steppach asserts that:

> 1. It is apparent that corruption played a role in the City Council's actions;
> 2. Mr. Steppach is entitled to an adverse inference against City Council members Joe Cooper, Edmund Ford , and Rickey Peete in all instances where they asserted their Fifth Amendment Privilege; and
> 3. Fraud or bad faith of a single member of the City Council voids the decision of the City Council as a whole.

Before reaching these specific allegations of error, we are first required to discuss the relevant procedural history regarding the allegations of fraud or corruption within the City Council.

### A. *Procedural History regarding Corruption.*

In the first instance, we recognize that neither Mr. Steppach's original petition for writ of certiorari, nor the first amended petition for writ of certiorari contain allegations concerning

the corruption issues *vis-a-vis* Messrs. Peete and Ford; rather, as noted in fn. 2, the allegations of fraud and corruption contained in the first amended petition concerned whether the Council followed its own procedures in reaching its decisions. Consequently, when the City Defendants filed the motion for summary judgment, it was on grounds that the Council's actions were not arbitrary, capricious, or otherwise illegal from a procedural standpoint. Specifically, because the issue of corruption of specific members of the Council had not been alleged by Mr. Steppach in his petition or amended petition, the City was not required to address the alleged corruption of, or by, Messrs. Ford and/or Peete in its motion for summary judgment. It appears that Mr. Steppach's first attempt to introduce allegations of other wrongs, crimes, or acts of Council members Ford and Peete was made in response to the City Defendant's motion for summary judgment. In his response to the motion for summary judgment, Mr. Steppach stated only that "troubling allegations" had allegedly emerged since the filing of the lawsuit, which allegations required further exploration. Mr. Steppach did not, however, provide specific facts to support this statement. Rather, he moved the court to stay the proceedings to give him an opportunity to conduct discovery concerning the alleged corruption. In the alternative, Mr. Steppach (concurrent with the motion to stay) asked the court for leave to file a second amended petition for writ of certiorari to add allegations of corruption. In support of his motion Mr. Steppach provided the affidavit of his counsel, J. Lewis Wardlaw, to detail the criminal complaints against Council members Ford and Peete, as well as various media articles concerning the alleged corruption. We note that Mr. Wardlaw's affidavit was proffered for the purpose of supporting the motion to stay the hearing on the City's motion for summary judgment and/or the motion to file a second amended petition, and was not filed as an additional statement of material facts to support Mr. Steppach's opposition to the motion for summary judgment; consequently, the issue of corruption within the Council was not (at the time of summary judgment) before the trial court. The City Defendant's opposed the Tenn. R. Civ. P. 56.07 motion to stay the hearing on summary judgment, arguing that the issue of corruption had not been pled, and that Mr. Steppach had failed to aver facts sufficient to necessitate a response from the City pursuant to summary judgment burden shifting requirements. Tenn. R. Civ. P. 56.03.[14] The City

---

[14] Tenn. R. Civ. P. 56.03 provides:

> 56.03. Specifying Material Facts. — In order to assist the Court in ascertaining whether there are any material facts in dispute, any motion for summary judgment made pursuant to Rule 56 of the Tennessee Rules of Civil Procedure shall be accompanied by a separate concise statement of the material facts as to which the moving party contends there is no genuine issue for trial. Each fact shall be set forth in a separate, numbered paragraph. Each fact shall be supported by a specific citation to the record.

(continued...)

Defendants also opposed any attempt to amend the petition to add allegations of corruption, and moved to strike Mr. Wardlaw's affidavit on the ground that it consisted entirely of inadmissible hearsay or information made without personal knowledge of the affiant. Despite the City's opposition, on January 19, 2007, the trial court entered an order granting the motion to stay the hearing on the City's motion for summary judgment in order to allow Mr. Steppach time to conduct discovery. That discovery consisted, in part, of depositions of the subject City Council members; however, as will be discussed, *infra*, the deposed City Council members asserted their Fifth Amendment privilege. Based upon the City Council members' failure to provide full answers in their depositions, it appears that Mr. Steppach realized that he might be unable to support his allegations of corruption at least at the summary judgment stage of the proceedings. In fact, the trial court's order, granting Mr. Steppach time to conduct more discovery before the hearing on the motion for summary judgment, also reflects that Mr. Steppach's motion for leave to amend the amended petition, memorandum in support thereof, and exhibits thereto are voluntarily withdrawn and expunged from the record by agreement of the parties. However, the order further indicates that "[t]he parties stipulated that the pleadings as filed, after removal of said papers, are sufficient to permit [Mr. Steppach] to argue any issues regarding allegations of illegality in the proceedings of the Memphis City Council on the subject matter of this case." In short, although the issue of corruption was not sufficiently alleged for purposes of summary judgment, the parties agreed that Mr. Steppach could pursue that issue if the case proceeded to hearing. On July 12, 2007, the trial court entered an order on the City's motion to strike Mr. Wardlaw's affidavit, which order

---

[14](...continued)

Any party opposing the motion for summary judgment must, not later than five days before the hearing, serve and file a response to each fact set forth by the movant either (i) agreeing that the fact is undisputed, (ii) agreeing that the fact is undisputed for purposes of ruling on the motion for summary judgment only, or (iii) demonstrating that the fact is disputed. Each disputed fact must be supported by specific citation to the record. Such response shall be filed with the papers in opposition to the motion for summary judgment.

In addition, the non-movant's response may contain a concise statement of any additional facts that the non-movant contends are material and as to which the non-movant contends there exists a genuine issue to be tried. Each such disputed fact shall be set forth in a separate, numbered paragraph with specific citations to the record supporting the contention that such fact is in dispute.

If the non-moving party has asserted additional facts, the moving party shall be allowed to respond to these additional facts by filing a reply statement in the same manner and form as specified above.

expunged the affidavit from the record pursuant to the parties' stipulations contained in the January 19, 2007 order. Consequently, the corruption issue was tried, at the subsequent hearing on the Street Closure, by consent of the parties, as agreed in the January 19, 2007 order and/or as contemplated by Tenn. R. Civ. P. 15.02. Accordingly, the fact that the amended petition was not further amended to include allegations of fraud and corruption is cured by Tenn. R. Civ. P. 15.02, which provides, in relevant part that: "[w]hen issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues."

The trial court's grant of partial summary judgment on the Planned Development was, in the opinion of this Court, premature because, as noted above, the parties agree that the Planned Development is contingent upon the approval of the companion Street Closure. We note that Mr. Steppach has not raised an issue concerning the grant of summary judgment on the Planned Development. That being said, from our reading of the record, it appears that, by the time the court heard proof at the Street Closure hearing, the parties were treating the Street Closure and the Planned Development as one in the same. Mr. Steppach's issues thus far have focused on whether the Council followed its own procedure in reaching its decision and, specifically, whether the Council properly interpreted the relevant ordinances. As determined above, we conclude that the Council did not violate its own procedures or ordinances in this matter. However, on the issue of corruption, Mr. Steppach argues that corruption tainted the Council's entire proceedings. As discussed in detail above, the fact that the Council's decision on the Street Closure was legislative in nature and the decision regarding the Planned Development was administrative in nature does not preclude this court, under *McCallen*, from approving the Council's actions if there is any reasonable basis for the decision. *McCallen*, 786 S.W.2d at 641. In short, because the issue of corruption does not involve the question of procedural compliance, we cannot reverse the Council's actions on the basis of corruption, unless certain criteria are met, and unless there is no reasonable basis for the Council's decision. *Id*. With this in mind, we now review each of Mr. Steppach's arguments on the issue of corruption.

## B. *Whether corruption played a role in the City Council's actions.*

From our review of the entire record, it appears that Mr. Steppach's evidence of corruption relates solely to criminal charges that were brought against two former City Council members, Messrs. Peete and Ford. Specifically, these charges were based upon allegations that Messrs. Peete and Ford received bribes in connection with their vote in another matter, which occurred months after the votes at issue in the subject case. Moreover,

it is public knowledge that Mr. Ford was ultimately acquitted of the charges. Mr. Steppach has not alleged facts to support a finding that City Council members accepted bribes for approving the Reddoch Street Planned Development or its companion Street Closure. Rather, Mr. Steppach relies upon indictments against former City Council members, arising from matters unrelated to the instant case.

Although a trial court has broad discretion, under a writ of certiorari, to permit proof outside the record of the Council proceedings, inclusion of such proof is, nonetheless, subject to the Tennessee Rules of Evidence. Tenn. R. Evid. 404 governs the admissibility of evidence of other crimes, wrongs, or acts committed by a defendant, and provides, in pertinent part, as follows:

> (b) **Other Crimes, Wrongs, or Acts.**–Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:
>
> (1) The court upon request must hold a hearing outside the jury's presence;
> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;
> (3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and
> (4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.[15]

---

[15] As discussed in ***State v. Mickens***, No. W2009-00586-CCA-R3-CD, 2010 WL 2697164, *3 (Tenn. Crim. App. July 8, 2010):

> Rule 404 was patterned in great measure on ***State v. Parton***, 694 S.W.2d 299 (Tenn. 1985), wherein our supreme court ruled that evidence of other crimes is generally inadmissible." ***State v. McCary***, 119 S.W.3d 226, 243 (Tenn. Crim. App. 2003), *perm. to appeal denied* (Tenn. July 7, 2003). Rule 404 "establish[es] that character evidence cannot be used to prove that a person has a propensity to commit a crime." ***Id***. (citing Tenn. R. Evid. 404(b); ***State v. Adkisson***, 899 S.W.2d 626, 645 (Tenn. Crim. App. 1994)).

(continued...)

Assuming a trial court substantially complies with the requirements of Rule 404(b), we will review the trial court's determination for an abuse of discretion. ***State v. DuBose***, 953 S.W.2d 649, 652 (Tenn. 1997). However, if a trial court fails to substantially comply with the requirements of the rule, then the trial court's decision is not entitled to deference by the reviewing court. ***Id.***

Mr. Steppach attempts to introduce evidence of other crimes, wrongs, or acts in another matter to prove that the City Council member's conduct in this matter was tainted. This is a tenuous argument. The City Defendants assert that the "facts" concerning Messrs. Peete and Ford are not relevant or admissible under Tenn. R. Evid. 404. According to the rule, in order for such evidence to be admissible, the trial court "must determine that a material issue exists other than the conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence"; moreover, the trial court must find proof of other crimes, wrongs, or acts under a clear and convincing evidence standard. Tenn. R. Evid. 404(b).

We conclude that the issue of corruption was tried by consent at the hearing on the Street Closure. However, we also conclude that there was not sufficient evidence introduced at that hearing to support the allegations of corruption within the City Council. In fact, the City Defendants objected to a trial of this issue based upon Mr. Steppach's alleged failure to present any competent evidence to support his contention. Mr. Steppach's argument that "[i]t is apparent that corruption played a role in the City Council's actions," appears to be mere supposition. From our review of the record, the scant proof of other crimes, wrongs, or acts of the former Council members is insufficient to prove corruption, in this matter, by clear and convincing evidence.

## C. *Adverse inference of corruption*.

---

[15](...continued)
Trial courts should take a "restrictive approach [to] 404(b) ... because 'other act' evidence carries a significant potential for unfairly influencing a jury." Neil P. Cohen et al., Tennessee Law of Evidence § 4.04[8][e] (4th ed. 2000). The more similar the conduct or act to the crime for which the defendant is on trial, the greater the potential for a prejudicial result. ***McCary***, 119 S.W.3d at 243 (citing ***State v. Bordis***, 905 S.W.2d 214, 232 (Tenn. Crim. App. 1995), *perm. to appeal denied* (Tenn. July 10, 1995)). relevant to an issue other than the defendant's character, such as intent, motive, identity, common scheme or plan, or absence of mistake. ***Id.***

Mr. Steppach next asserts that he is entitled to an adverse inference against Messrs. Ford, and Peete in each instance in which one of the Council members asserted his Fifth Amendment privilege in depositions. Specifically, Mr. Steppach asks this Court to "reverse the trial court and allow an adverse inference against...Edmund Ford and Rickey Peete in those instances where they invoked their Fifth Amendment Privileges." From our review of the appellate record, we are unable to determine whether the trial court made any ruling either permitting or denying an adverse inference against the City Defendants as a result of the Council members invoking their Fifth Amendment privileges.

Mr. Steppach cites to **Baxter v. Palmigiano**, 425 U.S. 308 (1976), as the seminal case on the issue of whether adverse inferences can be drawn from a party's invocation of the Fifth Amendment privilege in civil proceedings. We have determined that, Mr. Steppach's argument misconstrues the **Baxter** holding. Mr. Steppach appears to argue that **Baxter** creates a broad rule that allows an adverse inference to be drawn from invocations of the privilege against self-incrimination under all circumstances in the civil context. This argument is too broad. In interpreting the **Baxter** case, lower courts have uniformly held that the gravamen of the **Baxter** case is that such adverse inference can only be drawn when independent evidence exists concerning the fact that the party refuses to answer. *See, e.g.,* **LaSalle Bank Lake View v. Seguban**, 54 F.3d 387, 391 (7th Cir. 1995); **Peiffer v. Lebanon Sch. Dist.**, 848 F.2d 44, 46 (3d. Cir. 1988). An adverse inference may be drawn when silence is countered by independent evidence of the fact being questioned; however, that inference cannot be drawn when, for example, silence is the only answer to the allegation contained in the complaint. *See* **Nat'l Acceptance Co. v. Bathalter**, 705 F.2d 924, 930 (7th Cir. 1983). In such instances, when there is no corroborating evidence to support the fact under inquiry, the proponent of the fact must come forward with evidence to support the allegation; otherwise, no negative inference will be permitted. **LaSalle Bank**, 54 F.3d at 391.

Mr. Steppach has presented no evidence to support a finding that any Council member accepted a bribe in connection with the Reddoch Street Planned Development or the Street Closure. Moreover, because the second amended petition was not filed, the pleadings fail to allege that Council members Peete or Ford were bribed. Consequently, even if Messrs. Peete and Ford were parties to this lawsuit, there could be no proper adverse inference drawn against them for invoking their Fifth Amendment privilege in response to questions that ultimately lacked evidentiary support in the record. We, therefore, conclude that questions concerning other crimes, wrongs, or acts are not relevant, or admissible, to show conformity therewith.

**D. *Corrupt actions of one Council member should negate action of entire Council.***

Mr. Steppach's final argument on the issue of corruption within the City Council appears to be the only one considered by the trial court. By letter of May 24, 2007, the Chancellor summarized his findings on the City Defendant's motion for summary judgment, and directed the parties to prepare an order. This letter provides, in pertinent part, as follows:

> As for [Mr. Steppach's] claim that the votes of Edmund Ford and Ricky Peete are tainted and, as such, the decision of the entire council on the planned development is tainted, the Court is guided by the decision in ***Wellmont Health Systems v. Tennessee Health Facilities***[, No. M2002-03074-00A-R3-CV, 2004 WL 193074, *8 (Tenn. Ct. App. Jan. 29, 2004)]. There is no proof in this record that Ford and/or Peete improperly influenced the vote of other council members with respect to the Reddoch Street Planned Development. As such, the invalidation of their votes would not affect the outcome of the vote in favor of the planned development, which was approved by a 12-0 vote of the City Council.

As discussed in detail above, based upon the pleadings and summary judgment filings, we conclude that the issue of corruption was not before the trial court at the summary judgment phase of these proceedings. It is, therefore, somewhat confusing that the trial court states, in the May 24th letter, that there is no proof of improper influence. We assume that the court was clarifying the fact that Mr. Steppach had failed to sufficiently aver corruption at the summary judgment stage. In short, the trial court's statement in the May 27th letter does not change the fact that the corruption issue was not properly before the court at the time of the hearing on the motion for summary judgment. Moreover, none of the trial court's orders reference the May 24, 2007 letter, nor are the findings made in the letter replicated in any order. It is well settled that "the court speaks through its order not through the transcript." ***In re Adoption of E.N.R.***, 42 S.W.3d 26, 31 (Tenn. 2001). In ***Shelby v. Shelby***, 696 S.W.2d 360, 361 (Tenn. Ct. App. 1985), this Court stated that: "We do not review the court's oral statements, unless incorporated in a decree, but review the court's order and judgments for that is how a Court speaks." The City Defendants urge this Court to ignore the Chancellor's May 24, 2007 letter because it was not reduced to judgment. While we concede that the trial court speaks through its orders, this maxim does not preclude this Court from considering statements made in other form throughout the proceedings. In the interest of full adjudication on the merits, we have given credence to the court's May 24, 2007 letter. We nonetheless, conclude that the trial court reached the correct result based upon the lack of evidence in the record. Specifically, in the absence of evidence that Messrs. Peete or Ford improperly influenced other members of the Council, the actions of Messrs. Ford and Peete cannot be found to have tainted the entire February 21, 2006 vote.

The record of the Council proceedings filed in this case reveal that the Street Closure was approved by a 9-2 vote and that the Planned Development was approved by a 12-0 vote. Even if we allow, *arguendo*, that the record contains evidence that the votes of either Mr. Peete or Mr. Ford were improperly influenced, this fact, standing alone, would not show corruption of all votes cast. In *Wellmont Health Systems v. Tennessee Health Facilities Commission*, 2004 WL 193074, *8, this court stated that, "in the absence of proof that the 'participation' of the commissioner with the conflict, separate and apart from his vote, affected the outcome of the commission's decision, only the vote of the commissioner with the conflict is void *ab initio*." Based upon the *Wellmont* holding, in order to support his theory, Mr. Steppach would need to show that some or all of the seven other Council members that voted on the Street Closure and/or the ten other Council members that voted on the Planned Development were bribed or otherwise improperly influenced. From our review of the record, Mr. Steppach has failed to provide such evidence.

Even if we were to assume that there was sufficient evidence in the record to support Mr. Steppach's allegations of corruption and/or that Mr. Steppach is entitled to an adverse inference of corruption, as discussed above, we cannot lose sight of the fact that the City's decision on the Street Closure was legislative in nature. As such, this Court is prohibited, by the constitutional mandate of separation of powers, from inquiring into the motives of the Council in closing Reddoch Street. As noted above, in *Lynn v. Polk*, our Supreme Court held that the judicial department of Tennessee has no authority to invalidate an act of the legislature because it was procured by bribery of members of the legislature. *Lynn v. Polk*, 76 Tenn. at 121. This principle was reaffirmed in *Williams v. City of Nashville*, 15 S.W. 364 (Tenn. 1891). In *Williams*, the General Assembly adopted an act annexing certain real property to the City of Nashville. *Williams*, 15 S.W. at 364. Plaintiffs alleged that the act was procured by fraud resulting from a private agreement between a few members of the legislature and private interests. *Id*. at 366. Relying upon *Lynn v. Polk*, the *Williams* Court held that it could not constitutionally inquire into the motives of the legislature, nor could it void the legislation because it was procured by fraud on the General Assembly. *Id*.

Consequently, in the absence of proof of corruption in the February 21, 2006 vote, a judicial inference of corruption is not only erroneous, but unconstitutional. Tennessee Constitution, Article 2, Section 1; *McCallen*, 786 S.W.2d at 641; *see also Citizens for a Better Johnson City v. City of Johnson City*, No. E2000-02174-COA-R3-CV, 2001 WL 766997, *4 (Tenn. Ct. App. July 10, 2001) ("It is not the role of judges to set public policy for local governments, nor do we decide if a municipality has adopted the "best," in our judgment, of two possible courses of action. That is not our role. The concept of separation of powers precludes such an activist role on our part.").

## V. Grant of Summary Judgment

The City Defendants concede that the resolution approving the Reddoch Street Planned Development was expressly conditioned upon the approval of the companion Street Closure. Consequently, if the trial court found that the Street Closure was invalid, there would be no approval of the Planned Development pursuant to the Resolution. There is, of course, a difference between failure of approval by operation of the express language of the Resolution, and invalidating the Resolution as arbitrary and capricious. Here the trial court granted summary judgment to the City Defendants on the issue of whether the City Council's approval of the Reddoch Street Planned Development was arbitrary and capricious because: (1) the petition for writ of certiorari fails to allege that the City Council's action in approving the Planned Development was arbitrary, capricious, without legal foundation, or that same was otherwise influenced by fraud or corruption within the City Council, and (2) there was ample evidence in the record that the decision of the City Council in approving the Planned Development complied with Section Fourteen of the Memphis and Shelby County Zoning Ordinance, which allows for planned developments. Consequently, unless the approval of the Reddoch Street Planned Development fails by virtue of its express contingency upon the companion Street Closure (as found at Paragraph III (B) of the Outline Plan Conditions to the Resolution), the approval of the Reddoch Planned Development by the Council was correct. We conclude that the companion Street Closure was, in fact, valid as it was in compliance with the relevant procedural requirements, and was otherwise supported by sufficient proof in the record. Therefore, based upon our conclusion that the trial court correctly determined that the Street Closure was valid, we also conclude that the trial court did not err in granting partial summary judgment on the issue of the Planned Development.

For the foregoing reasons, we affirm the order of the trial court. Because the issue of the restrictive covenants was specifically reserved, pending review of the City Council's decision on the Planned Development and companion Street Closure, we remand the case for hearing on the restrictive covenant issue, and for such further proceedings as may be necessary and consistent with this opinion. Costs of this appeal are assessed against the Appellant, Nathan Steppach, Jr., and his surety.

_____
J. STEVEN STAFFORD, JUDGE