IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs June 5, 2018

IN RE: LEROY H.[1]

**Appeal from the Circuit Court for Wilson County**
**No. 2017-AD-73     Clara W. Byrd, Judge**

————————————————————

**No. M2017-02273-COA-R3-PT**

————————————————————

This appeal involves the termination of a father's parental rights to his minor child. The child's guardians, who had been granted custody of the child, filed a petition to terminate the father's parental rights. The trial court granted the guardians' petition after finding, by clear and convincing evidence, that four grounds for termination were proven—willful failure to visit, willful failure to provide child support, failure to provide a suitable home, and persistence of conditions—and that termination was in the child's best interest. We vacate the trial court's finding regarding one ground for termination but otherwise affirm the order terminating the father's parental rights.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Vacated in part, Affirmed in part, and Remanded**

BRANDON O. GIBSON, J., delivered the opinion of the court, in which CHARLES D. SUSANO, JR., and RICHARD H. DINKINS, JJ., joined.

W. Michael Kilgore, Mount Juliet, Tennessee, for the appellant, Leroy H.

Debra L. Dishmon, Lebanon, Tennessee, for the appellees, Lisa N., and Joseph N.

**OPINION**

**I. FACTS & PROCEDURAL HISTORY**

Appellant Leroy H. ("Father") is the legal father of Leroy H., Jr. ("Child"), who was born in July 2011. The Child's mother, Kristen B. ("Mother"), tested positive for cocaine upon the Child's birth, thus prompting the involvement of the Tennessee

———————————

[1] In cases involving minor children, it is this Court's policy to redact names in order to protect the child's identity.

Department of Children's Services ("DCS").  The same day, Father tested negative for illegal substances. DCS, therefore, placed the Child with Father, and the Juvenile Court of Wilson County, Tennessee, granted Father temporary custody.

Shortly after Father was granted temporary custody, DCS observed bruises and marks on Mother.  She claimed Father caused the injuries, and Father was subsequently arrested.  As a result, the Child was taken into protective custody and placed with Lisa N. ("Foster Mother") and Joseph N. ("Foster Father") (collectively, "Foster Parents").  At a preliminary hearing on August 7, 2011, both parents were drug screened.  At that time, Father tested positive for cocaine but Mother tested negative, and the court returned custody of the Child to Mother.

Less than two weeks later, Father was again arrested for domestic assault against Mother, and his bond restrictions restrained him from contact with Mother and the Child. On August 22, 2011, Mother's neighbors delivered the Child to DCS, explaining that Mother left the Child with them and had not returned.  DCS took the Child to the emergency room because the infant was struggling to breathe and was shaking uncontrollably. The Child was diagnosed with acute pneumonia, transported to Vanderbilt Children's Hospital, and placed in the Intensive Care Unit.  Because Mother could not be located and Father was unable to care for the Child due to his bond restrictions, DCS filed a petition for dependency and neglect, and the juvenile court again placed the Child in foster care for him to receive medical treatment.  Upon discharge from the hospital, the Child was again placed with Foster Parents.

On March 2, 2012, the juvenile court found the Child to be dependent and neglected.  He remained with Foster Parents until May 2012, when Mother and Father were granted a 90-day trial home placement, and the parents regained full custody of the Child when the 90-day trial concluded.  Nevertheless, Foster Parents maintained a close relationship with the Child.

The Child was again left in Foster Parents' care from April to June, 2013, when Foster Mother assisted Mother by transporting her to a domestic violence shelter.  Upon Mother's discharge, she resumed caring for the Child.  However, just one month later, on July 16, 2013, Mother and the Child arrived at Foster Parents' home in the back of a police car following another domestic violence incident with Father.  Mother signed an Immediate Protection Agreement voluntarily placing the Child with Foster Parents.  DCS subsequently filed a petition to transfer temporary legal custody to Foster Parents, again asking the court to declare the Child dependent and neglected, and the juvenile court entered a protective custody order granting them custody.

After a hearing in January 2014, the juvenile court once again declared the Child dependent and neglected due to drug exposure and long term domestic violence exposure in the parents' home.  *See* Tenn. Code Ann. §§ 37-1-102(b)(12)(F), (G).  Later that year,

in November 2014, the court awarded Foster Parents full legal custody. The Child has lived exclusively with Foster Parents since July 16, 2013.

On February 8, 2017, Foster Parents filed a petition in circuit court seeking the termination of the parental rights of both Father and Mother.[2] Against Father, the petition alleged: (1) abandonment by failure to visit, (2) abandonment by failure to provide child support, (3) abandonment by failure to provide a suitable home, and (4) persistence of conditions.

On October 5 and October 10, 2017, the circuit court held a hearing on Foster Parents' petition to terminate parental rights. Father, Foster Parents, Kathryn Kranitzky with DCS, and Debra Elkins of Safe Family Visits testified at the hearing. Mother was also permitted to testify remotely by video conference over the objection of Father's counsel.

Mother testified that she had an eight-year relationship with Father, and claimed that Father "[ha]s always been abusive." She testified that she remained married to Father at the time of the hearing[3] but that she had not seen Father in approximately three years. At the time of the hearing, Mother lived in South Carolina with her newborn child.

Mother testified to multiple incidents of domestic violence in the parents' eight-year relationship. According to Mother, she was hospitalized twice during her pregnancy with the Child due to Father's physical assaults on her. Mother also claimed that the Child was born prematurely as a result of Father's violence against her. In addition, Mother recalled specific domestic violence incidents that led to Father's arrest and/or her hospitalization in October 2011, October 2013, March 2013, July 2013, and November 2014, stating that Father's violence "[wa]s a cycle." Mother testified that despite Father's participation in a batterer's intervention program, the abuse continued. She explained that, following the incident in November 2014, she moved out of state to get away from Father. She further accused Father of ongoing drug and alcohol abuse.

Mother testified that, at the time of the hearing, she remained afraid of Father. She felt that it was in the Child's best interest to remain with Foster Parents and to not be returned to Father. Mother explained that Foster Parents had treated her and Father well

---

[2] Foster Parents also sought to terminate Mother's parental rights. As we further discuss below, Mother was not present at the hearing, and she stipulated to one of the grounds for termination alleged against her, willful failure to visit. The trial court ruled that Foster Parents had proved, by clear and convincing evidence, this ground for terminating Mother's parental rights and that termination was in the best interest of the Child. Mother has not appealed the trial court's order.

[3] According to Mother, she and Father were married in August 2013.

and that Foster Parents had tried to help her and Father maintain a relationship with the Child.

Debra Elkins testified that she owns Safe Family Visits, a private organization that monitors supervised visitation. She explained that in December 2014 she was put into contact with Father concerning supervised visits with the Child. However, she charged $25 per hour and a $100 intake fee, and Father informed her that he was not going to pay for services. According to Ms. Elkins, $25 per hour was "a very low rate" for her services and that other comparable agencies charge between $75 and $100 per hour. Ms. Elkins further explained that the $100 intake fee would have been divided between Mother and Father, so Father would have only been responsible for $50 of this fee had he continued with supervised visitation.

Father testified that, at the time of trial, he was living in a half-way house, which he also described as a "three-quarter house." He stated that he had been living there for approximately three weeks. He admitted that he "drink[s] beer" but denied that he used drugs. Father argued that he "probably" tested positive for cocaine in August 2011 "from removing [Mother's] drug activities, her paraphernalia and whatnot out of the house." According to Father, he was "clean and sober," and he estimated that the last time he had used alcohol was a month before the hearing.

Father also denied issues with domestic violence. He explained that when Mother would leave him with the Child, it was due to Mother's drug use, not his domestic violence. According to Father, his arrest for domestic assault in August 2011 was a misunderstanding. He testified that as a condition to his temporary custody of the Child, Mother was not supposed to stay the night at his house, and he was arrested when he attempted to force her out. However, he admitted to being arrested on numerous occasions on domestic assault charges.

Specifically, Father admitted that he was arrested in March 2011, twice in August 2011, October 2011, April 2013, May 2013, and November 2014 for domestic assault. He also admitted that he was arrested in June 2017 for public intoxication and in September 2017 for violating an order of protection against an ex-girlfriend. Father further admitted that he had been accused of domestic violence by a recent girlfriend just a few months before the hearing.

Regarding visitation, Father admitted that he had not requested a visit with the Child in at least two years. However, according to Father, he could not afford the fees for supervised visitation with the Child due to the costs of parenting classes, domestic violence classes, and his alcohol ankle monitor. He insisted that when he was contacted by Safe Family Visits in late 2014, he was told that he would have to pay $175 "to do the paperwork" plus $75 per hour while visiting with the Child. Father admitted that even after he had finished paying the aforementioned costs, he did not attempt to set up

supervised visitation again and that it had been more than a year since he had even inquired about visitation.

As to his income, Father testified that he had worked for an individual for the past 12 years "refurbish[ing] houses." He stated that he also worked for a brick mason, and between the two jobs, he worked a minimum of 40 hours per week. Father explained that he made $12 per hour in cash and that taxes were not taken out of his earnings. He testified that his current expenses were $150 per week to stay at the "three-quarter house." Although Father adamantly claimed he paid his child support every month, he admitted that in the months preceding the filing of the Foster Parents' petition, he did not pay enough to cover even the minimal child support he had been ordered to pay by the juvenile court.

Kathryn Kranitzky, a former DCS employee, testified that she was a team leader working in a supervisory position over the case from 2013 to 2014. She stated that, throughout her involvement with the family, her main concerns for the Child were "[o]ngoing domestic violence concerns, that the child was subject to ongoing drug exposure, alcohol exposure, and lack of supervision . . . as well as psychological harm." She testified that Father tested positive for cocaine "on more than one occasion" and that he also failed alcohol swab tests and would often fail to show up for scheduled drug screens.

Ms. Kranitzky also testified that Father was generally uncooperative with DCS. She explained that both he and Mother would make efforts to cooperate with DCS in the two weeks leading up to a court hearing, but then, according to Ms. Kranitzky, DCS would be unable to contact the parents for months at a time. She also stated that Father did not consistently exercise visitation with the Child.

Ms. Kranitzky testified that in May 2014 she became particularly concerned after an incident with Mother and Father. She began looking for Mother when she was not responding to Ms. Kranitzky's attempts to contact her. Ms. Kranitzky testified that she stopped by the parents' home, but Father claimed he did not know where Mother was, suggesting that Ms. Kranitzky try to call her cell phone. Ms. Kranitzky explained that she eventually found Mother crying and with visible bruises on her arms. Mother claimed that father had assaulted her and had stolen her money and cell phone. Ms. Kranitzky testified that police escorted Mother back to the home to pick up her belongings, and the Child witnessed Mother and Father again "g[e]t aggressive with each other."

She also testified that on one occasion during her time working on the parents' case, Father was arrested outside of Mother's place of employment. When police arrived, Father was holding an open container of beer and several more were found in his car.

Ms. Kranitzky opined that it was in the Child's best interest to remain with Foster Parents. She explained that his parents would continue to expose him to an unstable and unsafe environment and that Foster Parents are the only family he has ever known.

Foster Mother testified that she was a stay-at-home mother and that her husband was the pastor of their church. She stated that the Child was placed in their home when he was approximately four weeks old and that he had lived with her family for five of his six years of life. She testified that, at least initially, her goal was certainly to reunify the Child with his parents. She explained that she opened her home to Mother and Father in hopes to make a difference in their lives. She assisted Mother by driving her to various shelters and keeping the Child while Mother remained in the shelters. Mother testified that her family was the Child's "safe place" during this time in his life. At the time of trial, however, Foster Mother no longer believed that reunification was possible.

Foster Father testified that he and his wife initially made significant efforts to help Mother and Father maintain a strong relationship with the Child but that over time, Father's behavior led Foster Parents to shift their focus to the Child's wellbeing. He testified that the Child has never asked to see either of his parents; however, he testified that the Child appeared to have at least some memories of his Father. Foster Father recalled one incident when the Child was three or four years old when the Child saw Foster Parents' oldest son drinking a root beer out of a brown bottle. According to Foster Father, the Child got upset and insisted that drinking that "makes you mean."

Foster Parents both believed that it was in the Child's best interest to remain in their care, explaining "we're all he knows." They believed the Child would not be safe with Mother or Father and that he had shown no signs of missing them. They further testified that they wished to adopt the Child.

Following the hearing, on November 1, 2017, the trial court entered an order terminating both parents' parental rights to the Child. As to Father, it found that all four grounds alleged had been proven by clear and convincing evidence and that it was in the Child's best interest for Father's parental rights to be terminated. Father filed a timely notice of appeal.

## II. ISSUES PRESENTED

Father presents the following issues, which we have slightly reworded, for our review on appeal:

1. Whether the trial court erred when it allowed Mother to testify via video conference over Father's objection.

2. Whether the trial court erred when it found that it was in the best interest of the

Child to terminate Father's parental rights.

For the following reasons, the decision of the circuit court is affirmed in part and vacated in part.

### III. STANDARD OF REVIEW

"In Tennessee, proceedings to terminate parental rights are governed by statute." *In re Kaliyah S.*, 455 S.W.3d 533, 541 (Tenn. 2015). Tennessee Code Annotated section 36-1-113 "sets forth the grounds and procedures for terminating the parental rights of a biological parent." *Id.* at 546. Pursuant to the statute, parties who have standing to seek termination of parental rights must prove two elements. *Id.* at 552. First, they must prove the existence of at least one of the statutory grounds for termination listed in Tennessee Code Annotated section 36-1-113(g). *Id.* Second, the petitioner must prove that terminating parental rights is in the child's best interest, considering, among other things, the factors listed in Tennessee Code Annotated section 36-1-113(i). *Id.* Because of the constitutional dimension of the rights at stake in a termination proceeding, the petitioner must prove both of these elements by clear and convincing evidence. *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010) (citing Tenn. Code Ann. § 36-1-113(c); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 808-09 (Tenn. 2007); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002)). "Clear and convincing evidence" has been defined as "'evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" *In re Adoption of Angela E.*, 402 S.W.3d 636, 640 (Tenn. 2013) (quoting *In re Valentine*, 79 S.W.3d at 546). It produces a firm belief or conviction in the fact-finder's mind regarding the truth of the facts sought to be established. *In re Bernard T.*, 319 S.W.3d at 596.

Due to the heightened burden of proof in parental termination cases, we adapt our customary standard of review on appeal. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005). First, we review the trial court's factual findings de novo in accordance with Tennessee Rule of Appellate Procedure 13(d), presuming each finding to be correct unless the evidence preponderates against it. *In re Adoption of Angela E.*, 402 S.W.3d at 639. Then, we make our own determination regarding "whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights." *In re Carrington H.*, 483 S.W.3d 507, 524 (Tenn. 2016) (citing *In re Bernard T.*, 319 S.W.3d at 596-97). "The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness." *Id.* (citing *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009)).

## IV. DISCUSSION

### A. Mother's Testimony via Video Conference

At the outset, Father argues that the trial court erred by allowing Mother to testify against him at the termination hearing via video conference. Prior to testimony, Mother's counsel made an oral motion seeking permission for Mother to testify by telephone. Mother's counsel explained that Mother was residing out of state and that she was willing to stipulate to one of the grounds for termination of her parental rights. Father's counsel did not object to Mother testifying with regard to the termination of her own parental rights; however, Father's counsel did object to Mother testifying against Father via telephone. At the trial court's request, Mother obtained access to a device permitting audio-visual transmission and was permitted to testify by such means against Father, over the objection of Father's counsel.

Testimony in civil cases is generally governed by Tennessee Rule of Civil Procedure 43.01,[4] which provides:

> In all actions at law or equity, the testimony of witnesses shall be taken pursuant to the Tennessee Rules of Evidence. Also, for good cause shown in compelling circumstances and with appropriate safeguards, the court may permit presentation of testimony in open court by contemporaneous audio-visual transmission from a different location.

The Advisory Commission's comment to the rule reiterates that "three conditions must be satisfied: good cause, compelling circumstances, and adequate safeguards." Tenn. R. Civ. P. 43.01 Advisory Comm. Cmt. On appeal, Father contends that none of these conditions were satisfied. We disagree.

The record shows that, at the time of the hearing, Mother was living in South Carolina caring for her four-week-old child, and she testified that she did not have reliable means of transportation to travel to Tennessee for the termination hearing. The record further shows that Father had a history of domestic assault incidents with Mother both before and after the Child's birth, and Mother testified that she was afraid of Father.

---

[4] Tennessee Rule of Civil Procedure 1 provides in pertinent part:

> Subject to exceptions as are stated in particular rules, the Rules of Civil Procedure shall govern procedure in the circuit or chancery courts in all civil actions, whether at law or in equity, and in all other courts while exercising the civil jurisdiction of the circuit or chancery courts. These rules shall be construed to secure the just, speedy, and inexpensive determination of every action.

Although Mother sought to testify via telephone, the trial court required her to obtain means to testify by video conference before her testimony could continue.[5] The court also required Mother to provide her driver's license so that all parties were satisfied as to her identity.

Moreover, "[a] provision using permissive terms such as 'may' is generally regarded as discretionary." *In re Joel B.*, No. M2012-00590-COA-R3-JV, 2014 WL 4071908, at *3 (Tenn. Ct. App. Aug. 18, 2014) (citing *Steppach v. Thomas,* 346 S.W.3d 488, 505 (Tenn. Ct. App. 2011)). And, as this Court has previously explained:

> Our trial courts possess broad discretionary authority to control their dockets and the proceedings in their courts, *Hessmer* [*v. Hessmer*], 138 S.W.3d [901,] 904 [(Tenn. Ct. App. 2003], and the appellate courts do not disturb the exercise of such discretion unless the trial court has acted unreasonably, arbitrarily, or unconscionably. *Hodges v. Attorney Gen.,* 43 S.W.3d 918, 921 (Tenn.Ct.App.2000). Further, we "will not reverse a discretionary judgment of the trial court unless it affirmatively appears that such discretion has been explicitly abused to great injustice and injury of the party complaining." *Douglas v. Estate of Robertson,* 876 S.W.2d 95, 97 (Tenn.1994) (citing Tenn. R.App. P. 36(b); *Bruce v. Bruce,* 801 S.W.2d 102, 107 (Tenn.Ct.App.1990)).

*Barnett v. Tennessee Orthopaedic All.*, 391 S.W.3d 74, 79 (Tenn. Ct. App. 2012).

Nothing in this record indicates that the trial court abused its discretion, and Father has failed to demonstrate how he was prejudiced by the trial court's decision. We, therefore, conclude that the trial court did not err in allowing Mother to testify.

### B. Grounds for Termination

Although Father challenges the trial court's finding that termination of his parental rights is in the Child's best interest, he does not raise any issues regarding the four grounds that the court determined were present for terminating his parental rights. Still, the Tennessee Supreme Court has held that "in an appeal from an order terminating parental rights the Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal." *In re Carrington H.*, 483 S.W.3d at 525-26. We, therefore, will review each of the four grounds in turn.

---

[5] Both the parties and the trial court inconsistently refer to the method of Mother's audio-visual transmission testimony as either "Facetime" or "Facebook video conference." It is unclear from the record which service was used in this instance, but the record does indicate that audio-visual transmission was "live," or contemporaneous with the court proceedings.

*1. Willful Failure to Support*

Parental rights may be terminated for abandonment under Tennessee Code Annotated sections 36-1-102(1)(A)(i) (2017) and 36-1-113(g)(1) (2017) when a parent willfully fails to support his or her child for four consecutive months.[6] Such failure to support is willful when (1) the person is aware of his or her duty to support, (2) has the capacity to support, (3) makes no attempt to support, and (4) has no justifiable excuse for not providing support. *In re M.L.D.*, 182 S.W.3d 890, 896 (Tenn. Ct. App. 2005). In determining a parent's capacity to pay support, it is not enough for a petitioner to "simply prove that [the parent] was not disabled during the relevant timeframe" and therefore assume that he or she was capable of working and providing support. *In re Josephine E.M.C.*, No. E2013-02040-COA-R3-PT, 2014 WL 1515485 at *18 (Tenn. Ct. App. Apr. 17, 2014), *perm. app. denied* (Tenn. July 23, 2014). The petitioner has the burden of proving a parent's income and ability to pay when establishing willful failure to support. *In re Anna B.*, No. M2016-00694-COAR3-PT, 2017 WL 436510, at *7 (Tenn. Ct. App. Feb. 1, 2017) (*no perm. app. filed*). This can be established through evidence, showing the parent was able to support the child. *In re Noah B.B.*, E2014-01676-COA-R3-PT, 2015 WL 1186018 at *9 (Tenn. Ct. App. Mar. 12, 2015) (*no perm. app. filed*).

Because Foster Parents' petition to terminate Father's parental rights was filed on February 8, 2017, the relevant four-month time period was October 8, 2016, to February 7, 2017. The evidence at the hearing showed that Father was employed full time during the relevant four-month period making approximately $12 per hour. The juvenile court ordered him to pay $50 per week in child support.[7] However, the evidence demonstrates

---

[6] Effective July 1, 2018, Tennessee Code Annotated section 36-1-102(1)(A) no longer includes the term "willful" in its definition of "abandonment." Instead, under section 36-1-102(1)(I), "it shall be a defense to abandonment for failure to visit or failure to support that a parent or guardian's failure to visit or support was not willful." Thus, the parent or guardian will have to prove the affirmative defense of the absence of willfulness by a preponderance of the evidence. Tenn. Code Ann. § 36-1-102(1)(I). However, "[b]ecause this change is substantive rather than procedural or remedial . . . , the amended statute will not be applied retroactively to this case." *In re Gabriel B.*, No. W2017-02514-COA-R3-PT, 2018 WL 3532078, at *4 n.7 (Tenn. Ct. App. July 23, 2018) (citing *In re D.A.H.*, 142 S.W.3d 267, 273 (Tenn. 2004)).

[7] The only child support order present in the record is an order from the juvenile court filed in September 2013. In it, the juvenile court stated that Father "shall pay support in the amount of $50.00 per week beginning September 23, 2013, as *temporary token support*, until such time as the same is modified by this Court" (emphasis added). However, the record does not indicate that this order was ever modified. As we have explained before, "[t]he relevant statutes require a willful failure to support or to make reasonable payments toward the child's support, meaning, a willful failure to provide monetary support or more than token payments toward the support of the child." *In re Kylea K.*, No. E2017-02097-COA-R3-PT, 2018 WL

that from October 8, 2016, to February 7, 2017, Father paid a total amount of $639 in child support, which the trial court noted was an average of $37 per week.

Although the trial court found "by clear and convincing evidence that Father had the ability to adequately support the child," we cannot agree given the lack of evidence in the record concerning Father's expenses. Father testified that he paid $150 per week to live in the "three-quarter house" at the time of trial. However, he did not testify to his rent obligations or other living expenses during the relevant four-month period, and no other evidence was offered concerning such expenses. The burden to prove abandonment by willful failure to support rests on the petitioner. "[W]e cannot fault a parent for the absence of evidence regarding his or her financial situation." *In re James V.*, No. M2016-01575-COA-R3-PT, 2017 WL 2365010, at *5 (Tenn. Ct. App. May 31, 2017). In a termination case, "[t]he burden is not on the parent to demonstrate an inability to pay; the burden is on the petitioner to prove by clear and convincing evidence that the parent had the capacity to pay, made no attempt to do so, and had no justifiable excuse for not doing so." *Id.* (citing *In re Adoption of Angela E.*, 402 S.W.3d at 641). The burden is on the petitioner "to illicit lucid and intelligible evidence regarding [the parent's] ability to pay support and whether [his or] her failure to do so was justified so as to remove any 'serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" *In re Destiny H.*, No. W2015-00649-COA-R3-PT, 2016 WL 722143, at *10 (Tenn. Ct. App. Feb. 24, 2016) (quoting *In re Valentine*, 79 S.W.3d at 546). "A trial court cannot be left to speculate about this important element of failure to support." *In re L.J.*, No. E2014-02042-COA-R3-PT, 2015 WL 5121111, at *7 (Tenn. Ct. App. Aug. 31, 2015).

Without evidence establishing that Father had the ability to pay child support during the relevant time period, we conclude that Foster Parents failed to prove this ground of abandonment by clear and convincing evidence. Therefore, we reverse the trial court's termination on this ground.

*2. Willful Failure to Visit*

Parental rights may also be terminated for abandonment when there has been a willful failure to visit. Tenn. Code Ann. §§ 36-1-102(1)(A)(i), 36-1-113(g)(1). Failure to

---

3084530, at *6 (Tenn. Ct. App. June 21, 2018) (citing Tenn. Code Ann. § 36-1-102(1)(D)). Token support is support that "under the circumstances of the individual case, is insignificant given the parent's means." Tenn. Code Ann. § 36-1-102(1)(B). Because we conclude that the record does not contain adequate evidence of Father's ability to pay child support, we also decline to further consider whether $50 per week was truly "token support" given Father's means. The evidence here is insufficient to make that determination. *See In re Adoption of Angela E.*, 402 S.W.3d at 641.

visit is willful when a parent knows of his or her duty to visit, has the capacity to do so, makes no attempt to do so, and does not have a justifiable excuse for not doing so. *In re Audrey S.*, 182 S.W. 3d at 864.

The trial court found that, in addition to abandonment by failure to support, Father had abandoned the Child through willful failure to visit. After reviewing the evidence, we agree that this ground was proven by clear and convincing evidence. Under this ground for termination, the relevant four-month time period was also October 8, 2016, to February 7, 2017.

Father admitted at trial that he did not visit the Child during the relevant four-month period. In fact, Father testified at the hearing on the petition that he had not seen the Child in over two years. He did not allege that he was prevented from seeing the Child, and he admitted that he had not asked for or inquired about visitation since 2014. Thus, because Father knew of his duty to visit and could provide no justifiable excuse for failing to do so, we affirm the trial court's finding on this ground.

*3. Failure to Provide a Suitable Home*

Parental rights may also be terminated when the parent has failed to establish a suitable home for the child. Abandonment by failure to provide a suitable home occurs when:

> The child has been removed from the home of the parent or parents or the guardian or guardians as the result of a petition filed in the juvenile court in which the child was found to be a dependent and neglected child, as defined in § 37-1-102, and the child was placed in the custody of the department or a licensed child-placing agency, that the juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and for a period of four (4) months following the removal, the department or agency has made reasonable efforts to assist the parent or parents or the guardian or guardians to establish a suitable home for the child, but that the parent or parents or the guardian or guardians have made no reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date.

Tenn. Code Ann. § 36-1-102(1)(A)(ii). A suitable home in the context of this ground for parental termination requires a safe, stable environment and the presence of a caregiver that can meet the child's needs. *In re James V.*, 2017 WL 2365010, at *5. It requires

"more than a proper physical living location." *State v. C.W.*, No. E2007-00561-COA-R3-PT, 2007 WL 4207941, at *3 (Tenn. Ct. App. Nov. 29, 2007). "It requires that the home be free of drugs and domestic violence." *In re Hannah H.*, No. E2013-01211-COA-R3-PT, 2014 WL 2587397, at *9 (Tenn. Ct. App. June 10, 2014).

Here, the trial court found and Father admitted that—although he claimed to be sober—he was living in a "three-quarter house" at time of the hearing. He provided the court with two addresses of his residences prior to the "three-quarter house," one of which was the address of an apparent ex-girlfriend[8] where he had mail sent and occasionally resided. However, it was unclear which residence Father intended to return to once he left the "three-quarter house."

Further, Father vehemently denied *ever* using drugs, despite a wealth of evidence to the contrary. This, combined with Father's history of domestic violence and his failure to obtain stable housing, leads us to conclude that this ground was also proven by clear and convincing evidence. As the trial court aptly explained, "Father has made no efforts to provide a suitable home for the child, and his failure to make even minimal efforts to improve his home and personal condition demonstrates a lack of concern for the child to such a degree that it appears unlikely that a suitable home will be provided by Father." We agree with the trial court's finding that the Child was removed from Father's home as the result of a petition that led to the Child being found dependent and neglected, that DCS made reasonable efforts to assist Father in establishing a suitable home for the Child, and that Father failed to do so.

*4. Persistence of Conditions*

Grounds for termination of parental rights may also exist when there are persistent conditions that could subject the child to further neglect or abuse present in the home. Tennessee Code Annotated section 36-1-113(g)(3) states that persistent conditions are present when the child has been removed from the parent's custody by order of a court for a period of six months and:

> (A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent or parents or the guardian or guardians, still persist;
>
> (B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or parents or the guardian or guardians in the near future; and

---

[8] Father's "friend girl," at the time of the hearing, had an order of protection against him. As the trial court noted, "so legally he is not supposed to be at her residence."

> (C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

Tenn. Code Ann. § 36-1-113(g)(3)(A)-(C). Each of these elements must be proven by clear and convincing evidence. *In re Valentine*, 79 S.W.3d at 550. Termination on this ground prevents a child from lingering in uncertainty as a foster child if his or her parent cannot demonstrate an ability to provide a safe and caring environment for the child within a reasonable time. *In re A.R.*, No. W2008-00558-COA-R3-PT, 2008 WL 4613576, at *20 (Tenn. Ct. App. Oct. 13, 2008). "An essential prerequisite to establishing persistence of conditions is evidence of a 'prior court order removing the child from the parent's home . . . based on a judicial finding of dependency, neglect or abuse.'" *In re Aiden R.*, No. E2015-01799-COA-R3-PT, 2016 WL 3564313, at *9 (Tenn. Ct. App. June 23, 2016) (quoting *In re Audrey S.*, 182 S.W.3d at 874).

The juvenile court also found this ground for termination against Father, and we must agree. The Child was removed from Father's custody by the requisite court order in July 2013 due to exposure to drugs and domestic violence. The evidence shows that, at the time of the hearing, these conditions persisted. Father's ongoing domestic violence issues were demonstrated by his admitted arrest record. And as discussed above, although Father denied using drugs, Ms. Kranitzky with DCS reported that Father tested positive for cocaine on more than one occasion. Moreover, Father admitted to having an alcohol problem, and though he claimed that he was sober at the time of trial, he testified that he continued to live in a "three-quarter house."

In addition, the Child is currently in the care of a foster family that wishes to adopt, and to delay this integration into a permanent home would be unfair to the Child, who needs stability. Therefore, we affirm the juvenile court's termination of Father's parental rights on this ground.

### C. Best Interest

Because the trial court properly found the existence of multiple statutory grounds for termination, we must review the trial court's finding that termination of parental rights is in the Child's best interest. Tennessee Code Annotated section 36-1-113(i) provides a list of factors that are relevant when deciding what is in a child's best interest. However, the list is not exhaustive, and the court is not required to find the existence of every factor before concluding that termination is in a child's best interest. *In re Joseph F.*, 492 S.W.3d 690, 706 (Tenn. Ct. App. 2016). "The child's best interests must be viewed from the child's, rather than the parent's, perspective." *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004). "[W]hen the interests of the parent and the child conflict, courts are to resolve the conflict in favor of the rights and best interest of

the child." *In re Jacobe M.J.*, 434 S.W.3d 565, 573 (Tenn. Ct. App. 2013) (citing Tenn. Code Ann. § 36-1-101(d)).

On appeal, Father argues that the record contains no evidence to support a finding that the Child's best interest would be served by terminating his rights. The trial court, however, found termination to be in the Child's best interest because Father failed to maintain regular visitation or contact with the Child for nearly three years at the time of the hearing such that no meaningful relationship between Father and the Child remained. The juvenile court also considered that Foster Parents had provided the Child a safe, stable home for five out of the Child's six years of life, and that changing caregivers and physical environment would have a detrimental effect on him. The court further considered that the Child had bonded with Foster Parents, their other children, and their extended family and that the family wished to adopt the Child.

Our thorough review of the record leads us to agree with the trial court's findings regarding the Child's best interest. In addition, we note that this record establishes that the Child would not likely be safe in Father's care due to ongoing domestic violence and substance abuse concerns, which Father has done little to address in the six years since the Child was removed from his home. We, therefore, conclude that termination of Father's parental rights is in the best interest of the Child.

## V. CONCLUSION

For the aforementioned reasons, the decision of the trial court is hereby vacated in part and affirmed in part and remanded for further proceedings. Costs of this appeal are taxed to the appellant, Leroy H, for which execution may issue if necessary.

_____
BRANDON O. GIBSON, JUDGE